BLUE BELL, INC.

v.

The UNITED STATES.

No. 603–71.

United States Court of Claims.

April 8, 1977.

Eric R. Fox, Washington, D.C., attorney of record, for plaintiff. Ivins, Phillips & Barker, Washington, D.C., of counsel.

John Charles Ranney, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before SKELTON, NICHOLS, and BENNETT, Judges.

## OPINION

PER CURIAM:

This is a petition transferred from the United States Tax Court, where it was originally filed, for redetermination of plaintiff's excessive profits for its fiscal year ended October 31, 1967, as received or accrued by its predecessor in interest, Hicks-Ponder Company, under defense contracts and subcontracts. We have jurisdiction under 50 U.S.C.App. § 1218, *as amended.* The Renegotiation Board, by its unilateral order dated May 14, 1970, determined that plaintiff realized excessive profits in the amount of $275,000, there being no adjustment for state income taxes, and before computation of the Federal tax credit.

The case was tried before Trial Judge Philip R. Miller who has submitted a recommended decision and conclusion of law under Rule 134(h). After briefing and oral argument, the court partly agrees with the said recommended decision, with modifications, and adopts the same as its own, with modifications. Said modifications include the omission of all of Part H and substitution of the paragraphs immediately following, in the court's own words, leaning heavily on the Trial Judge's reasoning, but not repeating it, particularly where it is anticipated by our decision in *Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. —— (1976), which was tried after, but decided before, the instant case.

Hicks-Ponder in 1966 was a successful and growing manufacturer of men's and boys' casual slacks, work clothes and jeans. It had plants along the Mexican Border at Eagle Pass, Del Rio, and El Paso, Texas, and at Yuma, Arizona. Approximately 80 percent of its production was by contract for large retail outlets such as Sears Roebuck, Montgomery Ward, and J. C. Penney. It had not done Government business for many years. In January 1966, it received a "rated order" from the Defense Supply Agency (DSA) for the manufacture of 160,-000 pairs of men's fatigue trousers, following discussions that had continued for some time. The Trial Judge describes the circumstances in more detail. The action was, of course, a result of the growing requirements of the war or quasi-war in Southeast Asia.

The order necessitated retraining of employees, and conversion of facilities, despite the apparent resemblances, to the uninitiated, of civilian and military pants. Plaintiff's executives did not believe they could retrieve the expenses thus incurred unless they were given follow on orders which were not guaranteed. They could keep their facilities operating at capacity, and expanding, with civilian business. They doubted their ability to compete for Government business with its regular suppliers when competitive conditions returned. For these reasons, as a matter of business judgment, the plaintiff's executives were much opposed to accepting the order, and would not have done so if they

had not believed that coercive measures would be applied against them, in case of refusal, and if they had not believed in the existence of an emergency, wherein their assistance was greatly needed. The legal foundation and effect of a rated order is stated in *Major Coat Co., supra.* But according to a knowledgeable Government witness, it was not so much a matter of direct arm-twisting as a dawning realization that those who accepted rated orders could extend them to divert from noncooperating manufacturers the mill products, the textiles, they all needed to keep producing, and which would be in short supply. At any rate, the Government was able to place its rated orders without great difficulty, other producers yielding after initial reluctance, as plaintiff did, so no overt coercion was necessary. Still, a rated order is a rated order.

In *Major Coat Co., supra,* plaintiff accepted a similar rated order, for coats, and the adverse consequences to its civilian business were serious and so far as appears, irreparable. The consequences of entering military production, to plaintiff here, were less serious, though they did include a permanent loss of Sears Roebuck as a customer for work pants. Sears was retained for other business.

Once one was started on military production, to stay on it was the path of least resistance, if only to avert or delay another set of retraining and conversion expenses. Thus, after the use of rated orders had ceased, we see plaintiff bidding still for both prime and subcontract requirements for military pants. Such bids may be deemed to have been caused by the original rated order. As anticipated, plaintiff was unable to compete when competitive conditions fully returned, so it then, in 1968, reconverted all its facilities to civilian business as soon as might be.

In World War II, when the economy was fully converted to war production, (except for the bare minimum of essential civilian needs) we suppose all defense orders to private industry were "rated" and such ratings were welcome, for without having them to extend, a producer surely could not obtain needed materials and might be in difficulty as to labor. In World War II renegotiations, the ratings were so universal in the background that they were not even mentioned. A mention would not distinguish one case from another. However, we see in 1966–68 an economy with, in general, no mandatory conversion. We had, as the slogan went, "guns *and* butter." In such circumstances, the use of war powers to force military production on a small group of producers in a particular industry only, while the suppliers of other war material are those who desire to do that business, is to present problems to us if we are to renegotiate with fairness to all concerned. The Government procurement authorities fully recognized that they owed plaintiff special consideration. They were willing to negotiate any price, within reason and having justification, and the prices to plaintiff at least were much above what had been the going rate a few months earlier. Finding 115 shows that some awards at the time, under the same program, were at higher prices, and some were at lower, than plaintiff's. Is it fair to take away this special concession in renegotiation, and reduce plaintiff to the same ratio of profit to sales as is allowed to a producer who makes pants for the military at all times and of his own volition?

It would appear that the statutory risk factor, 50 U.S.C.App. § 1213(e)(3), would support some favorable allowance here, both as compared to what the contractor would earn in his normal peacetime business, which he is obliged to abandon in part, for the nonce, and as compared to what a regular supplier of an item would earn, which the contractor undergoing renegotiation supplied as a temporary emergency contribution. "Where a risk is borne that is not compensated in any comparable firm's profit" [here, a comparable of one of two above kinds] "it is nonetheless compensable by an upward adjustment of an otherwise reasonable profit for the risk-bearer, however judgmental in nature that adjustment must be." *Major Coat Co. v. United States,*

*supra,* 543 F.2d at 119, 211 Ct.Cl. at ——. If the Government is unable, or unwilling, to support enough production capacity to meet the needs of this limited emergency, by its regular suppliers, it should expect to extend some kind of special recognition to those temporarily brought in against their own volition, to fill the void. The issue reduces itself to one of quantum.

■ By the requirements of the fiscal year method, conversion costs incurred in 1966 were largely ineffective to reduce the renegotiable 1967 profit. The defense contracts were commenced in fiscal 1966, carried on in fiscal 1967, and completed in fiscal 1968, but a disproportionate amount of the costs were incurred in 1966 and 1968, causing the renegotiable 1967 profit to appear larger than it would have, stated as a percentage of sales, if all the defense business had been renegotiated in a single determination, as plaintiff would have us do. There is no authority for conducting the case in that manner and we must reject the invitation to do it. As to 1966, the receipts were at any rate enough to cover the start-up and conversion costs, and show a modest profit. The problem of determining a fair reconversion allowance is dealt with in the Trial Judge's opinion, and the difficulties are manifest. The reconversion costs were not directly allocable to renegotiable business in an accounting sense, but rather to the new civilian business that replaced the Government business. The claim for delays in picking up civilian business in 1968, are speculative in the extreme. We think that some reconversion allowance is mandated not as a cost but as an element to be considered in factor analysis. *Butkin Precision Mfg. Co. v. United States,* 544 F.2d 499, 211 Ct.Cl. —— (1976). It should not be allowed as a separate item, but should be subsumed in an upward profit adjustment for risk-bearing as attributable to forced entry into a specialized and temporary market, by virtue of the rated orders, as discussed above. Conversion and reconversion expenses, personnel retraining, and unabsorbed overhead, were all implicit as consequences.

■ In comparison of plaintiff's own civilian business with the military business under renegotiation, we approve in general the treatment of the material components to make them validly comparable, as the Trial Judge has done. That is, we think that for factor analysis purposes the Government Furnished Material (GFM) should be added to costs and sales to compare them with the civilian costs and sales, or else the material cost in the civilian business should be excluded (except for the 20 percent produced for inventory) or else, as the Trial Judge does, both. It seems clear that when the Government was not the buyer, the big private outlets such as Sears Roebuck very largely relieved Hicks-Ponder from having capital tied up in their work in progress. They ordered the textiles from the mills, allotted and sold them to plaintiff and plaintiff had 70 days from delivery in which to pay. Our analysis of the GFM problem in *Major Coat* is fully applicable here.

■ The Board in its statement of reasons said that the returns on capital employed and net worth were high and indicative of excessive profits. It noted the GFM as capital furnished by the Government, in effect, and also that plaintiff made extensive use of plants and machinery rented from affiliated companies. Whatever information the Board may have had, the record here does not show whether the kind of capital assistance the Government rendered via the GFM, the same in substance as plaintiff's big contract customers also rendered, was not usual in the plaintiff's industry. The Board has elsewhere recognized that use of rented facilities tends to remove the capital and net worth factor from relevant application. *See Butkin Precision Mfg. Co. v. United States, supra.* As there suggested, if facilities are rented from an affiliated owner, really the owner's interest should be consolidated for application of this factor. There is nothing in our record to show that the low ratio of capital employed to volume of business done, as well as to profits is not normal and usual in the industry plaintiff is a member of. In

the absence of comparable data as to other companies the information as to capital and net worth in our record is meaningless. *Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 351, 353, 208 Ct.Cl. 704, 748, 751–52 (1976). Nor have we had the benefit of any kind of expert testimony to interpret the meaning of such information. By calculations the Trial Judge accepted, the capital and net worth allocated to renegotiable business had a lower ratio to profit from renegotiable business, than the capital and net worth allocated to civilian business had to profit from civilian business. But that is just another way of noting the fact, obvious in the record, that the procurement authorities allowed plaintiff more profit per unit on military business, than it was getting on civilian business. If the reasons for doing this were not good, we do not need the capital and net worth factor to tell us we should require a refund; if they were good, the factor does not make them bad. The factor cannot be used for this kind of a bootstrap argument; for any valid use of it, comparisons to other companies of the same kind are necessary. Some industries need more capital than others, and defendant, having the burden of proof, could easily have told us what the capital needs of typical companies in plaintiff's industry were.

■ Here, as in some other renegotiation cases tried before us, the absence of expert testimony is a sore handicap to the trier of fact. Here, too, the absence of relevant comparisons is almost total. We know by Finding 114, of companies participating in the program, other than plaintiff; the Board cleared four, one of which earned (excluding GFM) as much as 13.7 percent of sales, and exacted refunds from eight, including plaintiff, leaving them with profit of 14.4 percent to 10.6 percent of adjusted sales. The Board must have learned all about these companies, but nothing has been allowed to transpire in the proceeding before us that would enable a comparison to be made according to the standards laid down in *Major Coat, Butkin,* and other of our cases. It is defendant that must suffer

from this paucity of evidence, as it has the burden of proof.

■ From the nature of things, with plaintiff appealing from a Board determination, we cannot use the determination appealed from as a comparison, nor those made with respect to the other companies mentioned in Finding 114. Compare *Major Coat Co. v. United States, supra,* 543 F.2d at 121–122, 211 Ct.Cl. at ——. If we could, the comparisons would be but superficial since we are vouchsafed no data as to their similarities to plaintiff or their differences, nor do we know how plaintiff places among them as to relative efficiency. Defendant in moving for rehearing in *Major Coat,* urged the difficulty of defining the relevant industry and obtaining the relevant comparative data. However great such problems may be in some cases, they hardly can be said to exist here. Since defendant has the burden of proof, the absence of this almost indispensible data could well lead to a clearance determination; however, in view of the comparative novelty of trials under the burden of proof rules we have prescribed, here as in *Major Coat,* we will attempt to construct an equitable refund determination with the scanty material provided.

■ The Trial Judge, in the portion of his opinion we have deleted, showed that a reduction of the profit level on renegotiable business to that shown on the civilian sales of the same year would reduce allowable profits to $146,000 and require a refund of $347,000, but this was on the inadmissible premise of excluding GFM from sales and costs, while making no comparable adjustment in the civilian sales. If one reconstructed renegotiable sales and costs to include GFM, the excessive profits would be $237,000. But if one excluded the GFM from the Government business and made a corresponding exclusion of the textile products used from the commercial business, the excessive profits elimination to reduce the renegotiable profits to the commercial level would be $202,000. The Trial Judge then averaged these two figures since they were

alternative computations to accomplish the same result, producing an excessive profit figure of $220,000. He raised this to $237,500, however, to reflect the extent to which he supposed the risks and burdens of commercial material acquisition exceeded those involved in dealing with GFM. He raised this to $251,000 to account for a presumed interest saving from the use of GFM. There is no record evidence to support these adjustments. *Cf, Major Coat Co. v. United States, supra,* 543 F.2d at 107–08, 211 Ct.Cl. at 1. He made an alternative computation based on capital and net worth, resulting in a figure of $228,000 or $229,000. We have already shown why we believe capital and net worth are out of court in this case. The Trial Judge attached little weight to results from application of that factor for reasons we believe are only less cogent. Finally, he subtracted $40,000 for 1968 reconversion costs, making an ultimate determination of $211,000. This would allow $282,000 retained profit on renegotiable business or, according to him, 12.21 percent of sales. The correct percentage is 13.43 percent. He failed to adjust the sales by the excessive profits to be eliminated, as he should have done. *Gibraltar Mfg. Co. v. United States,* Ct.Cl., 546 F.2d 389 (Filed December 15, 1976).

The Trial Judge compares his result to that in *Winfield Mfg. Co.,* 57 T.C. 439 (1971). This was a proceeding retained by the Tax Court as it had been processed too far along for transferability here under Pub.L. No. 92–41, § 3, 85 Stat. 97 (1971). It involved the 1966 year of a company that produced for DSA poplin wind-resistant trousers and cotton sateen trousers, such as plaintiff also produced. Its following 1967 year is included in the tabulation in Finding 114 herein. Counsel advised that Winfield also appealed the 1967 determination but it has been settled without adjudication. Winfield differed from the plaintiff in that it was a regular producer of military clothing. The Board determined a refund of $275,000. The Tax Court reduced this to $100,000. The Trial Judge was under the impression that this allowed 12.23 percent

of sales, a figure closely comparable to his own 12.21 percent. But one percentage is as mistaken as the other. The correct percentage of retained profit to adjusted sales, in *Winfield,* is 15.43 percent. From statements here and there in the published *Winfield* decision, we summarize that decision as follows:

| | |
|---|---|
| Reneg. Sales | $3,598,757 |
| Reneg. Profits | 640,014 |
| Percent profits to sales | 17.78% |
| Profits to be eliminated | $ 100,000 |
| Adjusted sales | 3,498,757 |
| Adjusted profits | 540,014 |
| Percent adj. profit to adj. sales | 15.43% |

GFM was excluded from sales and costs, but given consideration as set forth in the opinion.

■ This decision would not be so very important here if we had other adequate comparables. From the fact we do not have them, it gains importance. It is not *res judicata* or even *stare decisis,* because excessive profits determinations are factual in nature. *Newport News Shipbuilding Co. v. United States,* 374 F.2d 516, 179 Ct.Cl. 97 (1967). It rests on its own record, necessarily different from ours. However, defendant has not shown any reason why Winfield should be left after renegotiation with a far higher percentage of adjusted profit to adjusted sales than Blue Bell, Inc., is. Winfield was allowed a lower percentage by the Board than plaintiff, in the 1967 determinations (Finding 114). The Trial Judge evidently thought his own determination should come close to that in *Winfield,* and it seems reasonable to suppose that if he had computed the percentages in the two cases correctly, he would have considered allowing a higher retained profit percentage than he did. His own figures work out as 13.43 percent (see below) as compared to the Winfield 15.43 percent.

We follow the Trial Judge as far along the road he chose as the refund figure of $220,000 as a "starting point," *Butkin Precision Mfg. Co. v. United States, supra,* 544 F.2d at 505–06, 211 Ct.Cl. at —— based on allowing the same profit percentage for civilian and military sales, after proper ad-

justments to make the treatment of customer-furnished or -financed material comparable. There is nothing in the record to refute the comparability of the civilian and military business, except that the latter was somewhat more complex, or at least required more manufacturing steps. We differ as to the presumed interest saving and adjustment to the GFM. We reject the supporting calculation based on capital and net worth.

 Instead of a laborious attempt to determine actual reconversion costs, the allowability of which is difficult to determine, we favor allowing a percentage upward adjustment to cover and subsume such costs. However the GFM is treated, we think neither the rate of profit plaintiff enjoyed on its civilian business, to the extent it was permitted to remain in such business, nor the rate of compensation to others who were regular military suppliers, are reasonably sufficient to compensate plaintiff for incurring the burdens of a military supplier, involuntarily, for a brief period, and then the other burdens of giving up that business, equally involuntarily. We have the authority of defendant's expert in the *Butkin* case, *supra*, as to the propriety of making percentage allowances, under authority of the factors, in lieu of attempting to compute and reallocate to the renegotiable year costs allowable under the Internal Revenue Code only for other years, or not allowable at all for any year. Such allowances are necessarily painted with a broad brush and need not turn on disputes about component sums, nor do they necessitate resolution of doubtful allowability and allocability issues, one being traded off, as it were, against another. We followed defendant's expert in that case to the extent of using his percentage allowances as additions to the "starting point" there used. The Trial Judge found the cost impact of the conversion and reconversion here to be moderate, assessing the latter at $40,000, but if there had been none at all, we do not think the availability of the suggested allowance would have been refuted, at least in some perhaps smaller amount, since credit under the "risk" factor does not depend on the risk being realized in the actual experience of loss or misfortune. The function of a risk actually realized in a loss, is to resolve all dispute whether the risk actually existed.

As a result of our deliberations above, we determine as a matter of judgment that the plaintiff is entitled to a profit adjustment of 3 percent of sales, that is 3 percent of the figure of $2,310,000, to be added to the "starting point" figure. The percentage would of course be less if computed on sales including GFM. The allowance is rounded off at $70,000. Subtracting this from the tentative excessive profits of $220,000, we have a determined figure of $150,000, as the excessive profits to be eliminated.

The portions of the opinion we have adopted, with minor changes, gives our analysis under the statutory factors. We consider our determination reasonable in light of all of them.

The determinations compare as follows:

| | Board | Trial Judge | Court |
|---|---|---|---|
| Reneg. Sales | $2,309,810 | $2,310,000 | $2,310,000 |
| Reneg. Profit | 521,211 | 493,000 | 493,000 |
| Percent Profit to Sales | 22.6% | 21.34% | 21.34% |
| Profit to be eliminated | $ 275,000 | $ 211,000 | $ 150,000 |
| Adjusted sales | 2,034,810 | 2,099,000 | 2,160,000 |
| Adjusted profit | 246,211 | 282,000 | 343,000 |
| Percent adj. profit to adj. sales | 12.1% | 13.4% | 15.88% |

■ Upon the following findings of fact and for the reasons set forth in the opinion, pursuant to Rule 148, the court concludes and determines as a matter of law that plaintiff as successor in interest to the Hicks-Ponder Company realized excessive profits of $150,000 for its fiscal year ended October 31, 1967, from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. The case is remanded to the Trial Judge for further proceedings in the event the parties are unable to agree as to the appropriate allowance for state and Federal income taxes and interest on the net amount to be repaid to the Government by plaintiff.

The Trial Judge's opinion, as modified by the court, follows:

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge: This is a suit for redetermination of the excessive profits, if any, for the fiscal year ended October 31, 1967, to be refunded by Blue Bell, Inc. on contracts for the production of military trousers. Blue Bell is the successor in interest to the Hicks-Ponder Company, the government contractor, as a result of a merger effective March 31, 1969. Except as otherwise noted, the term plaintiff will be used interchangeably to refer to either or both companies. References hereinafter to plaintiff's 1967 year and to its other peripheral years will refer to the fiscal year ended October 31.

The Renegotiation Board determined that of $492,615 in profits received by plaintiff from government contracts in 1967, $275,000 was excessive. Plaintiff contends that it had no excessive profits, while defendant, the Government, maintains that the $275,000 is correct.

Hicks-Ponder was incorporated in 1920 and maintained its executive offices in El Paso, Texas. It was primarily engaged in the manufacture and sale of men's and boys' casual slacks, work clothes and jeans. Although it had manufactured military trousers for the Government during the Korean war, it normally did not seek government business.

In 1965 the Department of Defense determined that there was a shortage of clothing necessary for the Armed Forces in Southeast Asia. Defense Supply Agency (DSA) personnel then called upon various producers of civilian trousers and asked them to take government contracts for the manufacture of military trousers. Although the Government had the power to require acceptance of rated orders and the manufacturers were so told, in fact DSA never found it necessary to institute legal proceedings or other coercive acts to require acceptance of military clothing orders. DSA attempted to spread the rated orders out in a manner which would not use more than 25 percent of the capacity of any one company. Some manufacturers who had special problems, such as difficulty in converting to government work or the prospect of too substantial a loss of civilian business, were allowed to persuade DSA to cancel rated orders. Prices and contract terms were arrived at by negotiation after the rated orders were placed. At some time during 1966 sufficient manufacturer interest in obtaining government business was generated as to obviate the need for rated orders and to allow competitive bidding. By 1967 no pants contracts were the product of rated orders.

On January 27, 1966, after discussions during the prior month, DSA issued a rated order to plaintiff for the manufacture of 160,000 pairs of men's cotton sateen fatigue trousers. After commencing work on the first order plaintiff bid competitively on a second government sateen trouser contract, and on May 18, 1966, it received an award for 200,000 additional pairs. DSA also requested plaintiff to either submit a bid or receive a rated order for the manufacture of poplin tropical combat trousers. Shortly thereafter plaintiff bid on such a contract, and on May 16, 1966, it received an award for 35,000 trousers. On June 29, 1966, DSA issued a rated order to the company for an additional 82,500 combat trousers. On January 31, 1967, pursuant to its bid, plaintiff received an award for 210,000 additional pairs with an option for 105,000 more, which the Government in fact exercised.

Thereafter, during 1967 and 1968 plaintiff bid on other prime contracts but received no further awards because its bids were too high. However, during 1967 plaintiff obtained four subcontracts for sateen trousers which it completed during the year and carried over into 1968. Plaintiff's shipments of sateen and poplin trousers under government contracts and subcontracts during 1966–68 may be summarized as follows:

| | Sateens | Poplins | Total |
|-------|---------|---------|-------|
| 1966 | 289,449 | 65,028 | 354,477 |
| 1967 | 525,642 | 436,039 | 961,681 |
| 1968 | 105,433 | 47,659 | 153,092 |
| Totals | 920,524 | 548,726 | 1,469,250 |

Sixty-five and one-half percent of the shipments occurred during 1967, the renegotiable year at issue.

All of the government contracts were essentially identical in form. The Government furnished the fabric (GFM), and the contractor supplied the remainder of the materials and the cut, make, and trim labor. The contracts were at specified unit prices less the value of the GFM going into each unit. The contractor billed at the total unit price and prompt payment discount in favor of the Government was computed on the total unit price, but the value of GFM was deducted so that plaintiff received only the net.

At the time plaintiff commenced its government work in 1966, all of its plants were running at substantially full capacity. Plaintiff converted a portion of its Del Rio, Texas, plant to production of the sateen fatigue trousers and its entire Yuma, Arizona, plant to production of the poplin combat trousers. Prior to such conversion the Del Rio plant had been engaged in the manufacture of dress jeans, and the Yuma plant had been engaged in the manufacture of deluxe work pants for Sears Roebuck and Co., and casual slacks.

Substantially all of plaintiff's production workers were on a piecework basis, each trained to perform a single operation. For example, a standard commercial jean involved approximately 30 different operations and 30 different operators using approximately 20 different kinds of machines. If the piece rate did not result in an aggregate weekly wage equivalent to the minimum statutory hourly rate, plaintiff made up the difference.

Conversion from civilian production to military production necessitated retraining of the operators and the use of different and additional machines. The sateen trousers involved more than 30 different operations, while the poplin trousers involved 57 different operations. Retraining an operator to achieve the high degree of speed and efficiency which plaintiff demands of its employees for normal production could take from 8 to 16 weeks depending on the complexity of the operation involved. Retraining of entire units operating at successive stages of production to achieve company standards of speed and efficiency could take as long as 26 weeks.

Since during the retraining period the operator might be deprived of a portion of her customary wages through no fault of her own, plaintiff generally guaranteed such operator a wage equal to her previous average hourly piecework earnings, or at the least the statutory minimum wage.

The sateen trousers were somewhat more complicated to manufacture than were the dress jeans, the average time per dozen of the former requiring 2.6 hours as against 2.0 hours for the latter. The poplin combat trousers were considerably more complex than plaintiff's normal civilian production, requiring 57 different sewing operations per unit and 7.3 hours production time per dozen for the former, as against 40 different sewing operations and 3.7 hours per dozen for the civilian production at the Yuma plant. The Del Rio factory produced an average of 37.15 sateen trousers per operator per 8-hour day, while the Yuma plant produced an average 13.69 poplin trousers per operator per 8-hour day.

In addition to retraining operators for the military production plaintiff was also required to undergo the expense of purchasing or leasing new machinery to be able to perform this work and to idle some of its

prior equipment. The new machinery was, however, usable thereafter in civilian work.

Prior to commencing government work as well as during the period of government production Hicks-Ponder was primarily engaged in the contract sales business. In this type of business merchandise was not manufactured for plaintiff's inventory but rather for the needs of its customers, with the contracts being entered into in advance of production. The contract customer selected and paid for the material and then resold it to plaintiff at the same terms, and plaintiff picked up the material at the mill. During the years 1966 through 1968 approx- imately 80 percent of Hicks-Ponder's total sales were of the contract variety, with the bulk of such sales being made to Sears Roebuck and Co., J. C. Penney & Co., and Montgomery Ward. The government contracts to some degree disrupted such civilian business. However, as the table which follows shows, Hicks-Ponder's civilian business was not substantially adversely affected, since such sales were considerably higher than they had been in 1964 and 1965, and remained at about the same plateau from 1966 through 1968 with gross profits increasing in successive years from 1965 through 1968.

Hicks-Ponder Co.
*Sales and Gross Profits 1964-68 (In Thousands)*

| | Sales | | | Gross Profits | | |
|---|---|---|---|---|---|---|
| *Year* | *Reneg.* | *Other* | *Total* | *Reneg.* | *Other* | *Total* |
| 1964 | | $18,148 | $18,148 | | $2,712 | $2,712 |
| 1965 | | 20,314 | 20,314 | | 2,607 | 2,607 |
| 1966 | $ 715 | 23,635 | 24,350 | $ 186 | 2,885 | 3,017 |
| 1967 | 2,310 | 23,607 | 25,917 | 804* | 3,506* | 4,310 |
| 1968 | 411 | 23,619 | 24,030 | 82 | 3,767 | 3,849 |

\* See note to Chart A, *infra.*

---

Furthermore, as a percentage breakdown of Hicks-Ponder's sales to its major customers from 1964 through 1968 shows, during 1967, the renegotiable year at issue, not only was it able to keep most of its business with its major customers but it actually increased such business.

| | *1964* | *1965* | *1966* | *1967* | *1968* |
|---|---|---|---|---|---|
| Sears Roebuck | 54% | 55% | 56% | 52% | 51% |
| J. C. Penney | 10 | 10 | 9 | 15 | 14 |
| Montgomery Ward | 13 | 10 | 11 | 8 | 6 |
| Subtotal for Major Customers | 77 | 75 | 76 | 75 | 71 |
| Government | — | — | 3 | 9 | 2 |
| Independent | 23 | 25 | 21 | 16 | 27 |
| Total | 100% | 100% | 100% | 100% | 100% |
| Computed Sales to Major Customers (In Thousands) | $13,974 | $15,235 | $18,506 | $19,438 | $17,061 |

## A. The Allocation of Profit Sharing and Officers' Bonus Contributions

In determining whether or not plaintiff's profits on its government business during 1967 were excessive it becomes necessary to ascertain the sales, expenses and profits attributable to the renegotiable business as distinct from plaintiff's other business. The parties have made such an allocation but differ with respect to two items. During 1967 plaintiff maintained a profit-sharing plan for its employees. The company made annual contributions to the plan equal to 25 percent of its net income above 6 percent of the net worth of the company at the beginning of the taxable year, such contribution not to exceed 15 percent of the aggregate compensation of all participants. It also had a bonus plan for certain key officers, which entitled them to a fixed percentage of the company's profits. For 1967 plaintiff incurred $322,320 of expense with respect to its profit-sharing and officer-bonus plans.

Plaintiff allocated the $322,320 between renegotiable and non-renegotiable business on the basis of the respective profits earned in each segment before deducting the expense in question. Defendant allocated the profit-sharing element of the $322,320 on the same basis as direct-labor costs were allocated, and it divided the officers'-bonus element on the same basis as the general and administrative expenses were divided. Under plaintiff's theory, $76,133 of the $322,320 is properly allocable to renegotiable business, and $246,187 is attributable to non-renegotiable business for 1967. If defendant's position is correct only $52,360 of the $322,320 is property attributable to renegotiable business and $269,960 is allocated to plaintiff's other business. In short, plaintiff asserts that its renegotiable profits were $23,773 less than what defendant claims they were.

In support of its argument plaintiff relies upon sections 1459.1(b)(1), (5) and (6) of the Renegotiation Board Regulations (32 C.F. R.). These provide in general that the contractor must ordinarily follow the method of accounting used for federal income tax purposes. On its income tax return for 1967, as well as on its audited financial statement for the year, Hicks-Ponder deducted the $322,320 as expenses rather than as a part of the cost of goods sold. This treatment was not disturbed by the Internal Revenue Service in its audits. Plaintiff claims that this supports its theory of allocation, because under plaintiff's method of accounting all additions to direct labor costs and some portion of general and administrative expenses were required to be included in the company's inventory valuation used in computing costs of goods sold. Plaintiff also argues that because Hicks-Ponder only incurred profit-sharing and officer-bonus expenses to the extent it had profits, in any allocation they should be in proportion to such profits. Defendant argues that on the plaintiff's books and income tax return the officer-bonus and profit-sharing expenses were treated as general and administrative expenses in the nature of additional salary and therefore should be allocated in the same manner as were the other salaries.

It is obvious that neither the books and records, the audit reports, nor the income tax returns are helpful in resolution of this question. None of these had occasion to divide up the items at issue into renegotiable and nonrenegotiable expenses. Furthermore, there is no authority in any cited case which decides the issue.

On balance, defendant appears to be correct. The officer-bonus and profit-sharing distributions were expenses. They were deductible on the income tax returns only to the extent that they were part of total wages and salaries, which in the aggregate were reasonable in amount for services actually rendered. Internal Revenue Code, sections 162(a) and 404(a). As salaries, also they had to be necessary and ordinary expenses of the business. Under the circumstances, they should be allocated in the same manner which other salaries and expenses were allocated. To say that such additional salaries should be charged to renegotiable profits because the efforts of the recipients produced the renegotiable

profits assumes the conclusion in the case. It may well be that the high renegotiable profits were more the product of the Government's large wartime needs than the efforts of plaintiff's officers and other employees. If plaintiff's position were correct, the larger the excessive profits the more plaintiff would be entitled to charge officers' bonuses and profit sharings against them. Plaintiff would then have a device whereby it could directly reduce excessive profits by distributing them to its officers and other employees in the form of bonuses and profit-sharing distributions.

B. *Reasonableness of Profits with Regard to Sales and Normal Earnings*

Title 50, Appendix, United States Code, section 1213(e) provides that in determining excessive profits there shall be taken into consideration:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products.

Renegotiation Board Regulations, section 1460.10(b)(1) (32 C.F.R.), comments that comparisons should be made with "the contractor's own costs and profits in previous years and with current costs and profits of other contractors, if such information is available." Consideration for comparative purposes is also to be given to—

(2) * * * profits of the contractor, and of the industry, on products and services not subject to renegotiation, especially in cases in which the renegotiable business involves products or services substantially similar to those not subject to renegotiation. * * *

The products involved in this case are sufficiently similar to those involved in the contractor's normal commercial business, both during the year at issue and in other nearby years, so as to enable rational comparison.

On the basis of the agreed allocations and the foregoing resolution of the one allocation issue in controversy, plaintiff's renegotiable and non-renegotiable income, costs and expenses for the 3 years, 1966–68, may be set forth as shown on Chart A following.

CHART A

Hicks-Ponder Co.
*Income from Renegotiable and Non-Renegotiable Sales—Fiscal Years 1966-68 (In Thousands)*

| | Total Company | | | Renegotiables | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 |
| Sales | $24,350 | $25,880 | $24,031 | $715 | $2,273 | $411 | $23,635 | $23,607 | $23,619 |
| Material Savings Payments | | 37 | | | 37 | | | | |
| Total Receipts | | 25,917 | | | 2,310 | | | | |
| Materials | 13,802 | 15,206 | 14,074 | 88 | 273 | 44 | 13,714 | 14,933 | 14,030 |
| Direct Labor | 4,088 | 4,977 | 5,194 | 284 | 765 | 118 | 3,804 | 4,211 | 5,076 |
| Indirect Mfg. Expenses | 3,018 | 3,410 | 3,518 | 211 | 502 | 91 | 2,807 | 2,908 | 3,427 |
| Profit Sharing and Officers' Bonuses | | | | | (12)* | | | 12* | |
| Net Change in Finished Stock Inventory | 371 | (1,986) | (2,604) | (53) | (23) | 76 | 424 | (1,964) | (2,680) |
| Total Cost of Goods Sold | 21,279 | 21,607 | 20,182 | 529 | 1,506 | 329 | 20,749 | 20,101 | 19,853 |
| Gross Profit | 3,071 | 4,310 | 3,849 | 186 | 804* | 82 | 2,886 | 3,506* | 3,767 |
| Selling and Shipping | 803 | 897 | 1,129 | 33 | 61 | 12 | 771 | 836 | 1,117 |
| Advertising | 148 | 158 | 180 | 11 | 28 | 6 | 137 | 130 | 174 |
| General & Administrative | 773 | 757 | 886 | 57 | 136 | 32 | 716 | 622 | 854 |
| Interest | 254 | 201 | 283 | 19 | 23 | 9 | 235 | 179 | 274 |
| Profit Sharing and Officers' Bonuses | 241 | 322 | 289 | 14 | 64 | 5 | 227 | 258 | 284 |
| Adjust Books to Tax Basis | (18) | (11) | (7) | | | | (18) | (11) | (7) |
| Total Expenses | 2,201 | 2,325 | 2,760 | 134 | 311 | 64 | 2,067 | 2,013 | 2,696 |
| Net Profit for Reneg. | 871 | 1,986 | 1,090 | 52 | 493 | 18 | 819 | 1,493 | 1,072 |
| Other Income/Deductions | 26 | (26) | (61) | | | | 26 | (26) | (61) |
| Net Income per Tax Return | $896 | $1,960 | $1,029 | $ 52 | $ 493 | $ 18 | $ 844 | $1,467 | $1,011 |

* In determining gross profits on renegotiable and other business for 1967, in the absence of better evidence, 50 percent of the $23,773 increase in renegotiable profits attributable to the reallocation of officers' bonuses and profit sharing expense is allocated to cost of goods sold and gross profits, and the remainder to expenses.

Since defendant offered no evidence challenging plaintiff's costs, it must be assumed that plaintiff's costs were reasonable and that only the reasonableness of its profits are in issue.

Comparison of the results of plaintiff's 1967 operations with those of the 5 prior years and 1 subsequent year shows the following as set forth on Chart B.

## CHART B
### Hicks-Ponder Co.
### Comparisons of Results of Operations
### for Years 1962-68 (In Thousands)

| Year | Net Sales | Cost of Goods Sold | Gross Profit | % Gross Profits to Sales | Net Profits | % Net Profits to Sales |
|------|-----------|--------------------|--------------|--------------------------|-------------|------------------------|
| 1962 | $14,583 | $12,182 | $2,402 | 16.47 | $1,057 | 7.25 |
| 1963 | 16,349 | 14,026 | 2,323 | 14.21 | 781 | 4.78 |
| 1964 | 18,148 | 15,436 | 2,712 | 14.95 | 887 | 4.89 |
| 1965 | 20,314 | 17,283 | 3,031 | 14.92 | 665 | 3.27 |
| Reneg. 1966 | 715 | 529 | 186 | 26.01 | 52 | 7.27 |
| Other 1966 | 23,635 | 20,749 | 2,886 | 12.21 | 819 | 3.47 |
| Reneg. 1967 | 2,310 | 1,506 | 804 | 34.81 | 493 | 21.34 |
| Other 1967 | 23,607 | 20,101 | 3,506 | 14.85 | 1,493 | 6.32 |
| Reneg. 1968 | 411 | 329 | 82 | 19.95 | 18 | 4.38 |
| Other 1968 | 23,619 | 19,853 | 3,767 | 15.95 | 1,072 | 4.54 |

The Chart B tabulation shows that for 1967 plaintiff's renegotiable net profit represented 21.34 percent of sales as compared to net profit on its other sales of only 6.32 percent. It also compares with an average net profit of only 4.73 percent on other sales for the prior 5 years, and with an average of 4.93 percent on other sales for the entire 7-year period from 1962 through 1968.

Plaintiff contends that the comparison with the prior years suffers from the fact that it was expanding its business from 1963 through 1965 and thus had various additional expenses which reduced its net profit. However, plaintiff offers no precise or even approximate figures which might show the extent of any distortion for those years, and in any event comparisons of *gross* profits to sales also show a large disparity in favor of government-contract business. On renegotiable sales for 1967 it earned gross profits of 34.81 percent; while on other sales for the same year it grossed only 14.85 percent, for the prior 5 years an average of only 14.55 percent, and for the entire 7 years an average of only 14.80 percent.

Plaintiff also complains that the comparisons are inappropriate because 1967 renegotiable sales prices do not include the value of $1,747.021 in government-furnished materials (GFM), while civilian sales in the comparisons include the value of the entire materials entering into them. Defendant argues that there is no justification for attributing to plaintiff a return on the cost of materials it failed to lay out or to put at the risk of the business. For factor application purposes effect has been given to plaintiff's contention and to the extent the record permits, the income statements have been reconstructed to enable parallel comparisons of sales and net profits, first, by

including GFM in renegotiable sales, and second, by excluding the fabrics from commercial sales. The first is as appears on Chart C following:

## CHART C
### Hicks-Ponder Co.
### Comparisons of Sales and Profits for Years 1962-68
### Including GFM in Renegotiable Sales (In Thousands)

| Year | Net Sales | Cost of Goods Sold | Gross Profit | % Gross Profits to Sales | Net Profits | % Net Profits to Sales |
|------|-----------|--------------------|--------------|--------------------------|-------------|------------------------|
| 1962 | $14,583 | $12,182 | $2,402 | 16.47 | $1,057 | 7.25 |
| 1963 | 16,349 | 14,026 | 2,323 | 14.21 | 781 | 4.78 |
| 1964 | 18,148 | 15,436 | 2,712 | 14.95 | 887 | 4.89 |
| 1965 | 20,314 | 17,283 | 3,031 | 14.92 | 665 | 3.27 |
| Reneg. 1966 | 1,239 | 1,053 | 186 | 14.98 | 52 | 4.20 |
| Other 1966 | 23,635 | 20,749 | 2,886 | 12.21 | 819 | 3.47 |
| Reneg. 1967 | 4,057 | 3,253 | 804 | 19.82 | 493 | 12.14 |
| Other 1967 | 23,607 | 20,101 | 3,506 | 14.85 | 1,493 | 6.32 |
| Reneg. 1968 | 689 | 607 | 82 | 11.88 | 18 | 2.68 |
| Other 1968 | 23,619 | 19,853 | 3,767 | 15.95 | 1,072 | 4.54 |

It is apparent that even with the value of GFM included in its 1967 renegotiable sales plaintiff's profits, equivalent to 12.14 percent of reconstructed sales, were at a rate almost twice as high as the 6.32 percent rate of profit on its other sales for the same year, and about 2½ times the prior 5-year average rate of 4.73 percent on other sales and the average rate on other sales for the entire 7-year period of 4.93 percent. Reflecting the probability that such renegotiable profits were not merely a matter of lower selling, advertising and general and administrative expense on government business, but of plain excessive profits on manufacturing in the quantities sold to the Government, is the fact that *gross* profits on renegotiable business for 1967 are almost 5 percent higher than on other business for the same year. The 19.82 percent may also be compared with the average of gross profits on other business for the prior 5 years of 14.55 percent, and for the entire 8 years of 14.79 percent.

On the present record reconstruction of the comparative income statements to exclude the value of government-furnished materials from renegotiable sales and their equivalent from other sales can only be done with respect to the years 1966, 1967 and 1968. Furthermore, even on renegotiable sales the Government furnished the cloth but plaintiff supplied some of the materials (probably buttons, thread, pockets, etc.). The ratio is 86.29 percent of the material supplied by the Government to 13.71 percent by the plaintiff for the 3-year period. Therefore, 86.29 percent of material costs have been excluded from other sales.[1] The comparison reflects the following:

1. The material portion of the "Net Change in Finished Stock Inventory" were computed in the ratio of material cost to total cost of goods sold each year.

CHART D
Hicks-Ponder Co.
Comparison of Net Profits and Sales for Years 1966-68
Excluding GFM from Renegotiable Sales and Equivalent
Materials from Commercial Sales ($ In Thousands)

| | Renegotiable | | | Other | | |
|---|---|---|---|---|---|---|
| | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 |
| Sales Minus Materials | $715 | $2,310 | $411 | $11,551 | $11,869 | $12,953 |
| Net Profit for Reneg. | 52 | 493 | 18 | 819 | 1,493 | 1,072 |
| % Net Profit to Sales | 7.27% | 21.34% | 4.38% | 7.09% | 12.58% | 7.83% |

From the foregoing it is clear that even after value of GFM and comparable materials are excluded from both renegotiable and commercial sales for the 3-year period, 1966–68, plaintiff's reconstructed renegotiable net profits for 1967, equivalent to 21.34 percent of sales, were at a rate 70 percent higher than the 12.58 percent rate of profit on commercial sales for the same year and more than twice the average rate of 9.3 percent on commercial sales for the 3-year period.

From all of the foregoing comparisons it is apparent that plaintiff's rate of profit on sales to and for the use of the Government in 1967 was far in excess of its normal rate of profit on sales to others, both during the same year and in other nearby years.

The record is not adequate to make equally detailed comparisons with the profits of plaintiff's competitors.

C. *Plaintiff's Net Worth and Capital*

Section 1213(e) also requires that there be taken into consideration—

(2) The net worth, with particular regard to the amount and source of public and private capital employed.

Section 1460.11(a)(4) of the regulations comments that:

The relationship of profit realized on renegotiable business to the capital and net worth employed in renegotiable business will be used as one of the considerations in the final determination of what constitutes excessive profits. * * *

Plaintiff offered no evidence on this factor as a part of its prima facie case. However, defendant submitted in evidence a comparison of returns on capital and stock equity (or net worth) for 1967 for renegotiable and non-renegotiable business.

The initial problem was to make a fair allocation of the total capital and equity used in producing the 1967 income in each type of business. Defendant's FBI-accountant witness used various alternative methods for making such an allocation. His first method was to base the allocation on the comparative cost of goods sold for renegotiable business with total cost of goods sold, including GFM in both. This produced a 14 percent allocation to renegotiable business. An alternative comparison without GFM came out to a 7 percent allocation of capital for renegotiable business. The second method was to compare renegotiable direct labor with total labor. This showed a 15 percent allocation for capital used in renegotiable business. The third method compared direct labor for the 3 years, 1966–68, for renegotiable business with total direct labor for the same years, resulting in an 8 percent allocation. The fourth method derived its allocation from the proportion which 1967 renegotiable sales bore to total sales, both without GFM. From this there was derived a 9 percent allocation. The fifth method compared renegotiable sales

for the 3 years with total sales, producing a 5 percent allocation of capital used for renegotiable business. The sixth method compared specific assets used in production for renegotiable business with total assets. From this the witness derived a 9 percent allocation. Although the witness preferred method three, which produces an 8 percent allocation of capital used in renegotiable business to total capital, he concluded that an average of the various methods should be used. This resulted in an allocation of 10 percent of the capital and equity to renegotiable business and 90 percent to non-renegotiable business for the fiscal year 1967.

Plaintiff proposed no particular figure for allocation of capital and equity to renegotiable business and to non-renegotiable business.

As of the beginning of plaintiff's fiscal year 1967 plaintiff's stockholder equity was $5,017,164 and capital employed in the business (total assets, or stockholder equity plus debt) was $10,407,322, including therein $2,839,995 in current liabilities.

Applying allocation of 15 percent to capital and equity used in plaintiff's renegotiable business and 85 percent used in its other business, the dollar allocations as of the beginning of 1967 are as follows:

| | (In Thousands) | | |
| | Total | Renegotiable | Non-Renegotiable |
| --- | --- | --- | --- |
| Capital Employed | $10,407 | $1,561 | $8,846 |
| Stock Equity Employed | 5,017 | 753 | 4,265 |

Utilizing 1967 renegotiable profits of $492,615 and other profits of $1,492,960, on the basis of a 15 percent allocation plaintiff's returns on beginning capital and equity for 1967 were:

| | Renegotiable | Non-Renegotiable |
| --- | --- | --- |
| Return on Capital Employed | 32% | 17% |
| Return on Equity Employed | 65% | 35% |

Using an allocation of 10 percent to capital and equity used in plaintiff's renegotiable business and 90 percent used in its other business, the dollar allocations as of the beginning of 1967 are as follows:

| | (In Thousands) | | |
| | Total | Renegotiable | Non-Renegotiable |
| --- | --- | --- | --- |
| Capital Employed | $10,407 | $1,041 | $9,367 |
| Stock Equity Employed | 5,017 | 502 | 4,515 |

Utilizing 1967 renegotiable profits of $492,615 and other profits of $1,492,960, on the basis of a 10 percent allocation, plaintiff's returns on beginning capital and equity for 1967 were:

| | Renegotiable | Non-Renegotiable |
| --- | --- | --- |
| Return on Capital Employed | 47% | 16% |
| Return on Equity Employed | 98% | 33% |

Plaintiff also failed to offer any evidence of its own to challenge the comparative returns on capital and equity computed by defendant's witness, nor does it claim that the government-furnished material should be included in plaintiff's capital. It does claim that it had to idle old machines in which it had previously invested, but it furnished no financial data on the extent to which they were not yet fully depreciated.

Defendant urges that comparison may also be made with the return on capital and equity for 1962, but standing alone 1962 is not sufficiently close to be useful; and neither party has explained why it failed to offer evidence with respect to capital and equity for the intervening years.

### D. Extent of Risk Assumed

Section 1213(e) of the statute requires that consideration be given to—

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies.

There is no doubt that in initially undertaking the military work at the Government's request plaintiff incurred some financial risks. Its production employees were not expert seamstresses but largely unskilled workers whom it had itself trained, each to perform a single operation on a single machine. The military trousers were sufficiently different from their regular work so that it was necessary to retrain them, and particularly with respect to the more complex poplin combat trousers which

took about twice as long to make as the work pants displaced at the Yuma plant. Plaintiff also had to buy or lease new machines to meet the specification in the government contracts, although plaintiff had no guaranty as to the extent of the government business it might receive and did not know whether the cost of the machines could be fully amortized out of government business. However, to a large extent such risks were compensated by higher 1966 prices for which there was no renegotiation, and the machines were useful in later civilian work. In any event, plaintiff requests no specific allowance for these elements.

Plaintiff further claims it had to displace its production of civilian goods for its regular customers in two of its six plants; but this could not have been too serious since it apparently was able to expand the capacity of its other plants to enable sale of about the same dollar value of merchandise to civilian customers in 1967 as in the prior year with an even greater dollar amount going to its major customers than in 1965 and 1966.

Specifically at trial and in its brief plaintiff placed its greatest emphasis on its claims that in the determination of whether or not it had excessive profits on renegotiable business for 1967, there should be reductions for additional expenses it incurred in 1968 in converting back two of its plants to civilian business and for profits it lost in failing to obtain seasonal civilian business promptly as a result of its government work.

 Section 1213(f) of the statute prohibits carrybacks of cost from another year in computing excessive profits, but this does not necessarily mean that related items of cost in a succeeding year which are triggered by the renegotiable year's business may not be considered as a necessary or probable risk item for which a contractor should receive an allowance.

The Renegotiation Board Regulations on this subject follow the same rational. Section 1459.10 (32 C.F.R.) provides:

§ 1459.10 Costs incident to discontinuance of a renegotiable operation.

\* \* \* \* \* \*

(e) *Reconversion.* Costs of establishing or reestablishing commercial operations are not costs of performing renegotiable business and are not allocable thereto as costs incident to discontinuance of a renegotiable operation or otherwise. \* \* \*

On the other hand, section 1460.12 states:

§ 1460.12 Extent of risk assumed.

\* \* \* \* \* \*

(b) *Comment.* (1) The risks to be considered include but are not limited to risks incident to close pricing policies. \* \* \* In some cases a substantial degree of risk will be found in the temporary sacrifice of civilian markets to competitors, in order to accept more defense orders, or in the certainty of heavy reconversion expenses at the end of the emergency. \* \* \* The Board will give special consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation, \* \* \*.

And see also *A. C. Ball Co. v. United States,* 531 F.2d 993, 209 Ct.Cl. 223 (1976), and Nichols, *Equalizing Profit and Loss in Renegotiation,* 45 Va.L.Rev. 41, 59 (1959).

 It is concluded from the evidence that the cost of reconversion to plaintiff's normal peacetime business posed a recognizable risk which should be considered in fixing plaintiff's excessive profits for 1967; however, the amount involved is nowhere near the aggregate figure plaintiff claims.

Plaintiff asserts that the cost of reconverting its Yuma, Arizona, plant to civilian production was $64,117, consisting of excess make-up wages in the sum of $29,144 and lost overhead absorption of $34,973, and that the cost of reconverting its Del Rio, Texas, plant to civilian production was $23,723, for a total reconversion cost of $87,840, all of which was incurred in fiscal 1968.

As previously noted, the workers at plaintiff's plants were paid by piecework and

"make-up" was paid in addition to the regular rate to reach the statutory hourly minimum wage, or in some instances a guaranteed wage approximating 15 percent in excess of minimum wages, where the shortfall was not due to the workers' fault but because of slowdowns due to changed operations and consequent need for retraining. Plaintiff's officers testified without contradiction that 6 months was an average period for an entire unit of production to achieve normal maximum operating efficiency in civilian manufacture after termination of military production. Government-contract work was completed by the end of January 1968 and, therefore, the excess make-up was paid during the 6 months thereafter.

Plaintiff's treasurer-controller testified that during November and December 1967 and January 1968 plaintiff had reached a high level of productivity in its Yuma plant so that the amount it had to pay out as make-up wages was only 10 percent of its productive direct-labor costs; however, by July 1968, "During the six-month period, the accumulative make-up rate rose 6.67 percent above the sustained productivity or the sustained level at the time we discontinued the government work." Applying the 6.67 percent increase to the direct-labor costs of $436,935 at the Yuma plant for the period February 1 through July 31, 1968, he computed that the Yuma plant had increased make-up costs of $29,144 due to the reconversion from military to civilian production. To this sum plaintiff and its witness added $34,973 in unrecoverable overhead expense ordinarily allocated to direct-labor costs under plaintiff's method of accounting [2] but which was not recoverable in this instance because such labor costs were unproductive, making total Yuma reconversion costs of $64,117. Since Del Rio's 1967 direct labor was 37 percent of Yuma's he estimated Del Rio's reconversion costs at 37 percent of Yuma's or $23,723. Therefore, plaintiff claims, total fiscal 1968 reconversion costs at both plants were $87,840.

Two major questions are raised by plaintiff's reasoning which affect the validity of its results. First, if plaintiff is claiming that its profits on government contracts are not excessive because they do not reflect the excess costs it had to incur in order to reconvert to civilian work in the following year, plaintiff should properly compare its productivity in such renewed civilian work with that in prior civilian work rather than with its productivity in government work. For civilian production, plaintiff's norm for make-up pay was 16 percent of its direct labor rather than 10 percent, and plaintiff used the 16-percent figure in its budget for fiscal 1968. We are not told why the greater efficiency for government work. It may have been due to a more standardized product without style or material changes, to the absence of patterns to be matched, to the use of new more efficient machinery bought to perform the government work, or to a smaller labor turnover for steady work on large contracts. In any event, whatever the reason, it would be more valid to compare the 16.67 percent accumulative make-up rate for July 1968 with the 16 percent norm rather than with the 10 percent achieved on military production. Indeed, plaintiff's treasurer-controller conceded that such a revised comparison might be "equitable" and that had reconversion costs been computed by comparing the average make-up rates for the 6 months from February through June 1968 with the 16 percent norm rather than with the 10 percent, there would have been a reduction in conversion costs claimed of about $30,000 for the Yuma plant and $13,000 for Del Rio.

More important, plaintiff and its witness ignore the impact of the increase in the statutory minimum wage from $1.40 to $1.60 per hour, effective February 1, 1968. *See* 29 U.S.C. § 206(a)(1) (1970) and Pub.L. 89–601 § 602, 80 Stat. 830 (1966). The Hicks-Ponder 1968 and 1969 proxy statements incident to its merger with Blue Bell noted that this amendment to the law resulted in an adverse effect on earnings for

2. Plaintiff's overhead rate during the 6 months beginning February 1, 1968, was 120 percent of direct labor.

the 6 months ended April 30, 1968 and for all of 1968 because of increased wage levels both for those paid minimum wages and those paid in excess thereof. It is impossible to tell from the record the extent to which the increase in make-up costs was due to the reconversion from military to civilian production rather than to the 14 percent increase in minimum wage levels at the time of the changeover.

While not conceding the pertinency of plaintiff's reconversion costs, defendant's witness, H. Thomas Kirsche, an FBI accountant, recomputed them to be $14,644 (after correction from $14,359 due to mathematical error). Kirsche compared plaintiff's Yuma plant make-up rate for entire fiscal year 1968, 15.72 percent of direct labor, with the entire 1967 figure, 14.46 percent. He then multiplied half of the 1968 direct labor, $306,000, by the 1.26 percent difference to arrive at excess make-up of $3,856 for the first 6 months of 1968. The other element of reconversion cost was unabsorbed overhead. He found that on a pro rata basis Yuma's direct labor was $8,782 less than budgeted. Since the company computed overhead at 120 percent of direct labor, the unabsorbed overhead was 120 percent of $8,782, or $10,538. This resulted in total unabsorbed make-up and overhead due to reconversion of $14,394. Since Del Rio's 1968 direct labor on government work was 19 percent of Yuma's, under his theory Del Rio's unabsorbed make-up and overhead was 19 percent of $14,394, or $2,735. Thus, the total was $17,029. Since in his opinion plaintiff's 1967 renegotiable business was 86 percent of its total government business for the 3 years, his allocation of reconversion cost to 1967 was 86 percent of the $17,029, or $14,644.

Defendant's computations also contain several errors: First, defendant derives its post-government work make-up rate from plaintiff's average experience for the entire 1968 fiscal year. This disregards the facts that during the first 3 months (November 1967–January 1968) the Yuma plant was still engaged in government-contract work and operating at maximum efficiency, and during the last 3 months plaintiff had already completed its reconversion and attained its efficiency norm. Second, defendant errs in deriving its Del Rio reconversion cost from comparison of 1968 renegotiable contract-labor costs of Del Rio with those of Yuma, since it disregards the fact that Del Rio only operated on 1968 renegotiable contracts for 6 weeks while Yuma had 3 months. Had Del Rio not had any renegotiable work in 1968, defendant's method would have resulted in zero reconversion cost for Del Rio for that year. Next, the proper allocation of any reconversion cost to 1967 government contract work should be 65.5 percent rather than 86 percent. (See finding 26.) Finally, defendant likewise fails to take any cognizance of the February 1, 1968 increase in minimum wage as a variable affecting make-up expense for other than reconversion reasons.

Plaintiff also claims that as a result of being unable to regain its civilian-contract position until after the end of fiscal 1968, plaintiff failed to absorb $128,719 in overhead expenses which it continued to incur and which would have been absorbed if production had continued at prior budgeted levels. In explanation of this claim plaintiff asserts that when government work terminated at its Del Rio plant in December 1967 and at its Yuma plant at the end of January 1968, it was unable to replace it with civilian business for several months during 1968 primarily because it was between seasons for contracts for manufacture of merchandise for its principal customers, Sears Roebuck, Montgomery Ward and J.C. Penney. New contracts were not obtainable until the fall of 1968, such customers' needs having been satisfied by contracts let to other manufacturers in September-November 1967, when plaintiff was unavailable due to its government business.

Plaintiff computed the $128,719 in the following manner: The Del Rio plant had been producing 175 dozen sateen military dress trousers per day for the Government. When that work terminated, plaintiff was unable to replace any of it through March; it was unable to replace 75 dozen per day

from April through August; and it was still short 50 dozen per day through October. The missing production would have cost it $107,266 in direct labor for the year. Since plaintiff's budget for fiscal 1968 allocated overhead to the cost of its merchandise at a rate equivalent to 120 percent of its direct labor, the unanticipated termination of government work and consequent inability to replace it fully until after fiscal 1968 meant that $128,719 of continuing overhead expense (120 percent of $107,266) became unrecoverable.

While plaintiff's method for allocating overhead expense may be correct as a matter of accounting, it does not necessarily follow that plaintiff's 1968 overhead expenses were properly attributable to its 1967 government work. First, even if coincident with the termination of its government work plaintiff had been able to restore the equivalent of its civilian production immediately, there is no evidence that it would have reached 175˜dozen trousers for every working day or the equivalent amount of productive labor as in the performance of military contracts. Plaintiff offered no evidence of its direct labor at the Del Rio plant *just before* it undertook the government work. Civilian trousers involve varying patterns and styles while the sateen military dress trousers were of a single type, and the record reflects that plaintiff's employees were in fact substantially more efficient in government work (10 percent make-up pay versus 16 percent).

Second, there is no evidence that had plaintiff sought contracts in September-November 1967 for production of civilian trousers at Del Rio in 1968, it would have been able to obtain sufficient additional orders to replace fully its government work and to keep its employees occupied at the same full capacity as in the government work. Comparison of year-to-year sales reflects that

plaintiff's military production did not oust plaintiff's civilian business but was in addition thereto, since plaintiff's non-renegotiable business increased from 1965 to 1966 and remained about the same from 1966 through 1968.[3]

The assumptions plaintiff's counsel makes in its argument must also be appraised in the light of the following reports of business conditions in its proxy statements of September 1968 and February 1969:

During 1967 the apparel industry in general experienced depressed sales brought about by the pressure for reduced inventories at the wholesale and retail levels. This general condition contributed to Blue Bell's sales being below expectations, resulting in depressed profit margins, higher inventory financing requirements and higher selling and general and administrative expenses per dollar of sales volume. This general condition continued to affect Blue Bell's profits through the first quarter of the 1968 fiscal year.

and

The field in which Hicks-Ponder is engaged is highly competitive. Hicks-Ponder competes with a number of manufacturers, some of which are considerably larger, but no single manufacturer has more than a small percentage of the total apparel market.

The Defense Supply Agency's procurement specialist for the industry testified without contradiction that extensive government orders for military trousers caused an expansion of industry capacity, so that when government orders slackened at the end of 1967 civilian demand was inadequate to keep the manufacturers fully occupied, with the result that they attempted to underbid each other on the limited government business still available. This is cor-

---

**3.** Indeed, even for the 6 months ended April 30, 1968, Hicks-Ponder's aggregate sales despite reduced government business actually increased from the prior year. Six-month sales were $9,264,499. For the 6-month period ended April 30, 1967, its sales were $9,224,078.

However, both its gross and net profits declined; its gross profits for the same periods were $1,818,869 and $1,628,720, respectively; and its net earnings before income taxes were $8,354,426 and $8,903,416, respectively.

roborated by the evidence of plaintiff's own efforts to obtain additional government orders on at least six occasions during 1967 and 1968, which were unsuccessful because its bids were undercut by its competitors.

■ Third, as far as the record shows, plaintiff's failure to obtain sufficient and timely civilian work to replace fully its government business immediately upon the completion thereof may have been due to plaintiff's own misjudgment rather than to the fact of the government work or of its termination. As noted plaintiff's voluntary bids for additional government contracts on six occasions during 1967 and 1968 were too high. At least three of these, for the kind of sateen trousers manufactured at Del Rio, were submitted and rejected well prior to the fall of 1967, when plaintiff still had the opportunity to solicit orders from its mail order and department store customers for manufacture from February 1968 on. Plaintiff does not allege that it was unaware as to when its government orders would be completed, nor does the record show that anyone misled it into relying erroneously to its detriment on forthcoming additional government work. It continued to bid on government work because it found it more profitable. Under the circumstances, any unrecouped overhead expense loss which plaintiff may have suffered through lack of replacement work for the military trousers because its bids were too high, or for any other reason, may not properly be charged to the Government.

■ Plaintiff further claims a loss in 1968 profits of $94,000 as a direct consequence of the plaintiff having been engaged in government business from fiscal 1966 through 1968. Its treasurer-controller estimated that during fiscal 1968 the Del Rio plant could have manufactured 250,800 additional civilian trousers having an average sales price of $3 per unit, or $752,400, and that an assumed 6 percent profit rate before taxes would have returned $44,144 in profits. He also estimated $50,000 in lost 1968 profits from the unreplaced government business at the Yuma plant. Although Yuma substituted for its government business work that would have been manufactured at its El Paso plant, as a consequence thereof plaintiff claims lost profits at El Paso because the latter then took on a new type of garment in lieu of what it transferred to Yuma with a resulting increased $156,000 variance in labor costs over budget and consequent similar reduction in profits. Plaintiff's controller-treasurer without further explanation attributed $50,000 of this reduction to the change. For reasons already discussed with respect to the lost overhead claim, this is too speculative to warrant a finding in support of plaintiff's claim.

### E. Contribution to the Defense Effort

Section 1213(e) further states that consideration should be given to the—

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance.

Regulations section 1460.13 comments that this contemplates more than mere satisfactory performance of a kind common to defense contractors generally. It allows giving of credit for superior performance, completion of work ahead of schedule, unusual overcoming of difficulties and similar exceptional service. Plaintiff concedes that it did not make "any innovative or developmental contribution" but urges that it deserves some favorable consideration for its timely delivery of well-manufactured garments.

It has been found that the quality of Hicks-Ponder's trousers was good, its rejection rate was extremely minute, all of its deliveries were on schedule, its performance record was rated as "Excellent" and it was issued a "Quality Award" by the Government. This is given consideration under the factors to which it properly belongs.

### F. Character of Business

Section 1213(e) also requires that there be taken into consideration the—

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover.

Plaintiff claims it deserves favorable consideration under this factor "because of the extreme complexity of the poplin combat trouser which is one of the most difficult garments to manufacture in the garment industry", and also because it performed all production work without subcontracting any of it.

With respect to the former, the effect of such complexity as may exist in the construction of the combat trousers is reflected in the additional time and labor cost involved in its manufacture. To the extent additional training was involved it was also a part of the cost for which it was compensated. The record does not permit exploration of the effect, if any, which the added complexity may have had on value added. *See Butkin Precision Mfg. Co. v. United States*, 544 F.2d at 509–10, 211 Ct.Cl. at ——. The evidence does not indicate that the complexity was other than in the greater detail and reinforcement of a familiar product and material. There is no evidence that the Government's specifications were not adequate for anyone in the pants business to follow with proper equipment, or that plaintiff was only told of the end product desired and was required to exercise its own ingenuity and inventiveness to accomplish it. In comparing the renegotiable business with the commercial business, the absence of retraining and conversion problems in the latter is to be noted.

## G. *Efficiency of the Contractor*

Section 1213(e) of the statute states that:

 \* \* \* [F]avorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; \* \* \*.

Included in the plaintiff's receipts from government business was $36,747 in material-savings payments. It is not clear whether this designation is that of the plaintiff, its accountants, or the contracting parties. The government contracts are not in evidence and the two subcontracts which are in evidence do not use the term. In any event, plaintiff urges that this is direct compensation for efficiency and that, therefore, no part of it should be recoverable as excessive profits.

The testimony of DSA's clothing procurement specialist was that since the contract prices were unit prices it was necessary to allocate to each pair of trousers an estimated 2.2 running yards of fabric. In one or more instances the cost of the fabric contributed by the Government was fixed at $1.33 per unit, which represented the 2.2 yards at 60 cents per yard. The contractor was entitled to receive $2.76 per unit less the $1.33. If the contractor used less than the 2.2 yards it was entitled to retain the excess materials, but if the contractor used more, it came out of its share of the $2.76. The procurement specialist also testified that the number of yards required was an administrative determination rather than a precise figure, to enable Government accounting for the fabric, and it was up to the contractor to determine from his own experience how much material was required and set his bid or negotiated price to reflect the actual fabric he would require. This is confirmed by a teletype from DSA to plaintiff in December 1965 in which the Government offered to pay to plaintiff $2.41 per unit for manufacture of the sateen trousers less $1.33 for the GFM, but added that "In the event you determine that the sum of $1.33 is not accurate in relation to your material usage, indicate any recommended adjustment and the reasons therefor."

The $36,747 which plaintiff received as a result of using less fabric than the contract estimates represented 2 percent of the $1,747,021 in government-furnished material for the year 1967. It is hardly likely that

the Government would have used in the contracts unit material estimates which would not have permitted as little as 2 percent variations on either side by individual manufacturers. Without such tolerances some manufacturers making up the average might have run short of materials. There is no evidence in the record indicating the comparative degree to which other manufacturers profited from materials savings, nor the degree to which materials estimates normally contemplated such savings. Accordingly, it is not reasonably possible to conclude that the $36,747 represented specific compensation for efficiency rather than merely a part of the overall method of payment.

Plaintiff also urges that favorable recognition for efficiency should be given for the facts that the quality of the trousers was good and the rejections minute and that deliveries were made on schedule. Plaintiff also notes that DSA representatives determined that Hicks-Ponder was economical in the use of materials, facilities and manpower, and made very effective use of such facilities. Plaintiff further contends that the company's production per operator was above the production norm for other contractors, but there is no admissible evidence to support such a finding. If efficiency can be measured at all in reduced unit prices it appears that plaintiff's prices were only midway in the range of bid prices for similar products during 1966 and the early part of 1967, and that it was unable to bring its costs down sufficiently to obtain any government contracts thereafter although it bid on a number of solicitations.

As already noted, plaintiff is entitled to favorable consideration for the quality of its performance and its compliance with delivery requirements.