**PAGE–RIVER–CURRAN, a joint venture**

v.

**The UNITED STATES.**

**No. 566–71.**

United States Court of Claims.

April 19, 1978.

James J. Gallagher, Washington, D. C., for plaintiff; Gilbert A. Cuneo, Washington, D. C., attorney of record, Robert L. Ackerly, D. Joe Smith, Jr. and Sellers Conner & Cuneo, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and MILLER,* Judges.

## OPINION

PER CURIAM:

This is a petition, originally filed in the Tax Court, for redetermination of the excessive profits of a joint venture for its accounting year ended December 31, 1963. The Renegotiation Board determined by unilateral order that petitioner realized excessive profits in the amount of $1,200,000, before tax credits, and ordered elimination of that amount under 50 U.S.C. App. § 1215. The Tax Court petition was transferred here under Pub.L. No. 92–41, 85 Stats. 97, 98, and we have jurisdiction under the same statute, which amended 50 U.S.C. App. § 1218.

The case was tried before Trial Judge David Schwartz, who has submitted a recommended decision and conclusion of law under Rule 134(h). He would reduce the determination to $778,036 and both parties except. After briefing and oral argument, the court agrees with the said recommended decision and adopts the same as its

---

* Associate Judge, U.S. Court of Customs and Patent Appeals, sitting by designation.

own, with minor corrections, and with a few added comments which here follow. We adopt as our own the findings of fact (except for the conclusion of law at the end, which is replaced by ours), but they are not printed herewith, having been furnished to the parties. All the most significant facts are stated in the opinion.

The plaintiff was formed to submit proposals for the single contract here in issue. The joint venturers were Page Communications Engineers, River Construction Corporation, Curran and Company, and Fischbach & Moore, Inc. The contract called for installation in South Dakota of the buried intersite cable communication system in one of the six wings of the intercontinental ballistic missile network known as the Minuteman. The original price, as bid, was $5,476,132, but there were numerous changes, and plaintiff suffered from numerous delays that were attributable to defendant, including delays in delivery of government furnished material. The defendant obligated much over the contract price from the very outset. Rather than a series of equitable adjustments, the parties decided to negotiate a single new fixed price. This was done in late April and early May 1963, and the new fixed contract price was $13,000,000 of which $1,152,000 was the estimated allowance for profit, equal to 8.8 percent of the agreed price. Throughout the negotiation, it was assumed and expected that the negotiated price would allow 10 percent profit on costs. By the date of this supplemental agreement, much of the work had been done and major problems overcome. The trial judge believed that plaintiff at the date of the negotiation could have estimated its costs for the entire job with approximate accuracy. The parties still debate what uncertainties remained. Clearly there were some, but we do not consider it helpful to measure them exactly.

The plaintiff's entire revenues from the job were $13,200,494 and its costs, $10,484,147, leaving a net profit of $2,716,347. These figures are reviewed in this proceeding in their entirety, and revenues under no other contract are involved, because this renegotiation was conducted on a completed contract basis of accounting.

The trial judge, after an exhaustive analysis, constructed a reasonable profit figure by allowing 10 percent, not on actual costs, but on the estimated costs in the negotiation, thus, $1,152,000, the profit contemplated in the 1963 negotiations. Then he added 5 percent of actual costs, for efficiency, and 2½ percent for contribution to the defense effort, making a total non-excessive profit of $1,938,311.

Defendant criticizes this as too generous and would restrict the plaintiff to the 10 percent of costs it said it expected.

■ We note at the outset of our review that the trial judge characterizes the cost estimates plaintiff used in the 1963 negotiation as "inflated." This is true in the sense that hindsight shows they were excessive by a large figure. It does not mean they were willfully false or that plaintiff had corrective data that it withheld. Defendant disavows such a contention, and necessarily. The Truth in Negotiations Act, Pub.L. No. 87–653, 76 Stat. 528, 10 U.S.C. § 2306(f), *as amended,* was applicable to this negotiation. Defendant considered but rejected invoking it, but now would accomplish the result it would have achieved if it had invoked that Act, and established that the entire excess of the estimated over the actual cost was contrary to data in plaintiff's possession. The Renegotiation Act is intended for a different purpose. If plaintiff had achieved a large saving in actual as against estimated costs, in a fixed price negotiated contract, negotiated in good faith before performance began, no one would have doubted that in renegotiation it would have been at least entitled to share in the benefit the saving achieved. We are not convinced that the circumstances dictate a different result here. If defendant had wanted to restrict plaintiff to 10 percent on audited costs, it could have proposed a contract to that end. If the original contract overruns had been left to be settled by change order and equitable adjustment, the same result would have occurred, substantially. In insisting on roll-

ing the whole thing into a fixed price contract, without cost escalation, defendant cannot but have supposed it was protecting itself against possible costs in excess of the estimates. We think that by achieving actual costs below good faith estimates, plaintiff is entitled to credit in renegotiation under the "efficiency" and "reasonableness of cost" factors, even though the estimates in question came late and applied partly to costs actually realized already, though not accurately known.

■ We conclude, then, using as a "starting point" the expected profit of $1,152,000 —which certainly should stand even though the cost on which it was based was lowered—it would be reasonable to share equally between plaintiff and defendant the benefit inuring from the reduction in costs below the estimates. The trial judge's determination approximately does this, and therefore it need not depend wholly on his 5 percent and 2½ percent allowances, which without corroboration might seem arbitrary to some minds.

■ We note that the Renegotiation Board's allowed costs were $10,717,000 and its profit before renegotiation $2,431,000 instead of the trial judge's determination of $10,484,147 and $2,716,347, respectively. The principal but not the sole reason for these differences is that the Board "as a matter of judgment" allowed $300,000 for overhead expenses in the home offices of the several joint venturers. Apparently it was what is often called in this court a "jury verdict." It stands to reason that the delays and difficulties, for which defendant was chargeable, must have increased these costs, and the Board made its allowance despite a lack of detailed substantiation. The trial judge disallowed $208,885, allowing only $103,052. See his footnote 1 and findings 132, 133. Finding 132(i) reads: "The principle of a home office charge is found to be reasonable and fair." He disallowed as he did for lack of substantiation. However, when it stands to reason a cost has been incurred, but it cannot be substantiated on audit, the proper technique in renegotiation is to consider it under the

statutory factor: "Reasonableness of Costs and Profits." We consider that this item tends to support the trial judge's determination of a reasonable level of profit while reducing to some extent the dependence on his allowances for efficiency and contribution, of 5 percent and 2½ percent. Other revenue inclusion and cost allowance disputes we deem to be inconsequential in face of the broad-brush nature of renegotiation.

■ Plaintiff urged the trial judge to add to sales and costs the value of government-furnished material (GFM), mostly cable and splice cases. This would have halved or more the profit rate, *i. e.,* the percentage of profit to costs or sales. He refused to do so, a refusal which we support. We note that in several recent cases we have done this. In *Camel Manufacturing Co. v. United States,* 572 F.2d 280, Ct.Cl. (Decided February 22, 1978), we rejected as not binding on us a Board ruling to the contrary. In agreement are *Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976) and *Blue Bell, Inc. v. United States,* 556 F.2d 1118, 213 Ct.Cl. 442 (1977). However, the circumstances in those cases were different and they are not necessarily binding as precedents here. The change of course does not add to or subtract anything from profits. It diminishes percentage ratios of profits to sales and costs, and therefore may have an influence on minds that rely too much on such percentages. More legitimately, in many cases it facilitates comparisons to other business of the contractor, or to other companies. A contractor is entitled to profit on GFM, as well as on material he supplies, but not at the same rate. As to GFM, his contribution may, as the trial judge says, be considered one of management, but management also is entitled to some reward.

■ We think the existence of a large amount of GFM under the contract, excluded from sales and costs, is a matter to be considered under the statutory factor: "Character of business." Such consideration tends to support the trial judge's determination of a reasonable level of profit, while reducing to some extent the depend-

ence that has to be placed on his allowances for efficiency and contribution of 5 percent and 2½ percent.

It is not, of course, required that favorable consideration under the factors must be cumulated as separate percentage allowances. *See Camel Manufacturing Co., supra,* at p. 310.

Defendant says that none of the venturers, considered separately, were accustomed to a profit of as much as 10 percent on costs. Assuming this to be true, the record does not disclose the nature of that other business sufficiently for us to weigh the significance of the fact. Each side in oral argument blamed the other for the paucity of the record in that regard. Defendant cannot benefit from this empty comparison; plaintiff does not ask to.

Except for the foregoing, the trial judge sufficiently speaks the opinion of the court.

Chart A, printed herewith, shows in summary form the differences between the Board decision and the trial judge's decision which we adopt.

CHART A

Page-River-Curran, a Joint Venture
Renegotiation, Year ended 12–31–63

|  | Renegotiation Board | Trial Judge |
|---|---|---|
| Reneg. Sales (Revenue) | $13,148,000 | $13,200,494 |
| Renegotiation Profit | 2,431,000 | 2,716,347 |
| Percent | 18.5% | 20.6% |
| Profit to be Eliminated | 1,200,000 | 778,036 |
| Adj. Sales (Revenue) | 11,948,000 | 12,422,458 |
| Adj. Profit | 1,231,000 | 1,938,311 |
| Percent | 10.4% | 15.6% |

*Conclusion*

Upon the above per curiam opinion of the court, and the trial judge's opinion and his findings, which have been furnished to the parties, and are adopted by the court, but not printed, the court concludes as a matter of law that plaintiff realized excessive profits in the gross amount of $778,036. The case is remanded to the Trial Division under Rule 131(c) for proceedings to determine what payment, if any, plaintiff has already made, the appropriate credits and adjustments for state and federal taxes, according to law, the allocation of the excessive profits among the venturers for the purpose of determining such credits and adjustments,

the interest due according to law, the net amount to be awarded defendant or plaintiff in view of the foregoing, and to recommend the amount of the judgment to be entered for plaintiff or defendant.