**GRANITEVILLE COMPANY**

v.

**The UNITED STATES.**

**No. 11–72.**

United States Court of Claims.

June 13, 1979.

Eric R. Fox, Washington, D.C., for plaintiff; Ivins, Phillips & Barker, Washington, D.C., of counsel.

Gerald D. Freed, with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This renegotiation case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Judith Ann Yannello, filed July 12, 1978, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, together with the opposition thereto, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. It is therefore determined by the court that for the fiscal year 1966, plaintiff realized excessive profits in the gross amount of $300,000 with this amount to be decreased by appropriate tax credits and to be adjusted for interest as allowed by law.

## OPINION OF TRIAL JUDGE

### YANNELLO, Trial Judge:

This is a case under the Renegotiation Act of 1951, as amended, 50 U.S.C. App. §§ 1211–33 (Supp. V, 1975), in which the issue is whether plaintiff, Graniteville Company, realized excessive profits in 1966 from renegotiable contracts or subcontracts for the weaving and finishing of cloth.

Jurisdiction is founded on 50 U.S.C. App. § 1218, as amended, (Supp. V, 1975), which grants a contractor who is aggrieved by the Renegotiation Board's determination of excessive profits (here in the amount of $600,000) an opportunity for de novo examination of the issue in this court. Plaintiff urges that its earned profits under renegotiable contracts were reasonable and that no part thereof was excessive. Defendant urges that plaintiff realized excessive profits in the amount of $447,252.

It is concluded that plaintiff realized excessive profits in the gross amount of $300,000.

### I.

#### Character of Business.

Plaintiff is what is known as an "integrated textile company." Such a company performs two operations—the manufacturing or weaving of yarn into cloth or greige goods and the application of finishes, such as color or water repellency, to the cloth. These two operations involve different degrees of complexity, risk, and profitability. Plaintiff's commercial and renegotiable sales differ with respect to the proportion of sales attributable to these two operations. In addition, within each operation, particularly finishing operations, differences may exist with respect to the complexity or risk of various types of products.

The Renegotiation Act, section 1213(e), provides that, in determining excessive profits, consideration shall be given to the character of business including the complexity of techniques involved. The Renegotiation Board Regulations, 32 C.F.R. 1460.10(b)(4) (1977), also provide that when a contractor is engaged in more than one class or type of business, the varied characteristics of the several classes of business will be taken into consideration. Under this statutory factor it is necessary to ex-

---

* Although the court adopted the trial judge's separate findings of fact, and the appendix which are set forth in her opinion, they are not printed herein since such facts as are necessary to the decision are contained in her opinion.

amine the character of plaintiff's manufacturing and finishing operations, the types of products comprising finishing operations, and the composition of plaintiff's commercial and renegotiable business with respect to these operations and products.

### 1. *Manufacturing Operations*

The manufacture of greige goods is a highly competitive business and is considered a known science with only limited opportunities for technological innovation. The techniques involved in weaving cloth are not complex. There is a relatively ready market for imperfectly manufactured greige goods. The profits anticipated from manufacturing operations are customarily less than would be anticipated from finishing operations. In 1966, plaintiff operated nine plants devoted to manufacturing operations. Very little data has been furnished concerning the types of cloth manufactured by plaintiff.

Plaintiff's nonrenegotiable sales of $113,-445,301 were generated, in large part, from manufacturing. Although the precise commercial manufacturing sales have not been identified, they have been generally described as constituting about 75 percent of total commercial sales. Nonrenegotiable manufacturing sales may thus be approximated at about $85,000,000. Most of these sales have not been identified by product, while about $2,300,000 have been identified as the result of the manufacture of duck cloth.

Plaintiff's renegotiable sales were $5,765,057 of which $1,160,975 have been identified as manufacturing sales, or about 20 percent of total sales. Most of the renegotiable manufacture was attributable to duck cloth, with a minor portion attributable to other cloth such as twill. Duck cloth is a heavy cloth made from plied yarns consisting of two or more strands twisted together.

In addition to in-house manufacture of greige goods, plaintiff obtained cloth and material for finishing from other sources. Plaintiff purchased some greige goods from other suppliers, in which case the price paid for the purchases is included in plaintiff's sales. Plaintiff did not realize a manufacturing profit on these goods but the purchase price paid included the profit realized by the actual manufacturer or supplier. In addition, plaintiff received greige good materials from customers (either the government or prime contractors) for finishing (referred to as Customer Furnished Material or CFM). The values of CFM are not included in the sales dollars stated above. The values of CFM include the profit realized by the actual manufacturer of the cloth.

In nonrenegotiable business, purchases of greige goods have been identified in the amount of only about $3,000,000 which is insignificant in terms of overall sales of over $113,000,000. In addition, plaintiff received CFM valued at about $10,000,000. In commercial business, therefore the great majority of greige goods were manufactured in-house, with a value of about $85,-000,000.

In renegotiable business, purchased greige goods have been identified in the amount of $1,330,074 or about 23 percent of total renegotiable sales of $5,765,057. In addition, plaintiff received CFM valued at $7,899,693. Thus, in renegotiable business, significant quantities of greige goods used in finishing were derived from "outside" sources and a relatively small portion—less than one-fourth—of renegotiable sales were derived from in-house manufacturing with sales of $1,160,975.

Finishing sales are customarily measured by the revenues generated from finishing operations alone and exclude the values of the greige goods being finished regardless of their source.

### 2. *Finishing Operations.*

Of plaintiff's nonrenegotiable sales of $113,445,301, most sales were attributable to manufacturing, as described above. Although the precise commercial finishing sales have not been identified, they have been generally described as constituting about 25 percent of the combined manufac-

turing and finishing sales, or about $28,000,-000.

Renegotiable finishing sales, exclusive of the values of the greige goods being finished, were $3,274,008 or almost 57 percent of total renegotiable sales of $5,765,057. Thus, while commercial sales were derived primarily from manufacturing operations, over one-half of renegotiable sales, excluding CFM, were derived from the finishing of greige goods.

Finishing operations are less common in the industry than are weaving and present a greater opportunity for technological innovation and specialization. Finishing operations are more complex than manufacturing operations. There is more difficulty in selling imperfectly finished cloth than there is in selling imperfectly woven cloth. The degrees of complexity and risk in finishing operations may vary depending on the type of finish being applied. "Specialty" finishes, such as that for fire-retardant children's sleepwear produced by another company, are performed by only one company and are developed through extensive and unique research and development. The profitability of finishing operations customarily exceeds that of weaving operations, and "specialty" finishing may produce premium profits within finishing operations.

Plaintiff performed its finishing operations at two plants, Gregg and Woodhead. The finishing performed at Gregg involved the application of dye stuffs and chemicals suspended in water base solutions while the finishing at Woodhead involved the application of dyes and chemicals dissolved in petroleum base solutions. The operations at Woodhead were more complex, and required greater supervision, than the finishing at Gregg. The operations at Woodhead presented greater hazards, particularly of fire, than did operations at Gregg due to the difference in the nature of solvents. Graniteville maintained its own fire department at Woodhead and equipped that facility with explosion-proof machinery and blow-out walls.

The finishing under renegotiable contracts involved a very small amount of twill and sateen apparently finished at the Gregg plant. Almost all of the finishing under renegotiable contracts was performed at Woodhead and the approximately 20 million yards of cloth finished under such contracts accounted for almost one-half of all Woodhead production in 1966.

The finishing under renegotiable contracts, at Woodhead, consisted of primarily two types or products and involved two types of cloth: osnaburg and duck cloth.

*Osnaburg.* Plaintiff applied an olive drab color and mildew resistant finish to osnaburg cloth. Osnaburg is a lightweight open-construction fabric similar to cheesecloth which the government used primarily for sandbags. The techniques involved in osnaburg finishing were not complex but, due to the types of solvents used, this finishing presented a particularly high risk of fire. Approximately five companies in 1966 possessed a capability of performing this finishing.

By virtue of the operational hazards and risks, such as fire, present in osnaburg finishing, plaintiff is entitled to favorable consideration for the character of this renegotiable business, as has been recognized by defendant.

*Duck cloth.* Under renegotiable contracts plaintiff also applied a FWWMR (fire, water, weather, and mildew resistant) finish to duck cloth which the government used primarily for tents, tarpaulins, and gun covers. The FWWMR finish involved complex application techniques, including three-step processing, and was one of the most complex finishes applied by plaintiff. From 1965 to 1970, approximately nine companies possessed the capability of performing this finishing.

By virtue of the complex operational techniques present in FWWMR duck cloth finishing, plaintiff is entitled to favorable consideration for the character of this renegotiable business, as has been recognized by the government.

In addition to stressing the complexity of FWWMR finishing—a characteristic which the government did not dispute—plaintiff

urges that this finishing constituted a "specialty" item. The FWWMR finish was basically developed during World War II and, although plaintiff performed this finishing at that time, plaintiff did not participate in the initial research or development. FWWMR finishing had also been used during the Korean conflict during which use various improvements in the finish and the fabric were explored. Although plaintiff produced FWWMR during that time, it did not participate in this continued research or development. FWWMR finishing was again used by the government in connection with the Vietnam War and plaintiff again began performing these operations in 1965, at which time it perfected its operations for applying the finish to the duck cloth modified as a result of the research of the 1950's. There is no evidence that such preparatory efforts continued through 1966. Moreover, such preparatory efforts are not uncommon in finishing operations and are not of a sufficient magnitude or nature to warrant consideration as research and development.

Plaintiff's performance of FWWMR duck cloth finishing, although involving complex techniques, is not therefore considered to be a "specialty" item or one entitled to premium levels of profitability associated with "specialty" items.

All the renegotiable finishing, with sales of $3,274,008 or 57 percent of total renegotiable sales, involved complex FWWMR duck cloth or hazardous osnaburg finishing performed at the Woodhead plant. This finishing accounted for one-half of the yardage produced at that plant. Of the $28,000,000 attributable to commercial finishing—about 25 percent of total commercial sales—only $300,000 has been identified as involving complex duck cloth finishing, and the remainder included operations at Gregg as well as at Woodhead, with the Gregg plant's operations being described as neither complex nor hazardous.

Thus, renegotiable business consisted of a greater proportion of the more complex finishing than did commercial business while commercial business consisted of a greater proportion of the less complex manufacturing operations. Within the finishing operations, renegotiable business consisted of a greater proportion of the complex or hazardous products than did commercial business.

*Summary.* By virtue of the complexity of FWWMR duck cloth finishing and the operational hazards, such as fire, present in osnaburg finishing, plaintiff has been found to be entitled to favorable consideration under the statutory factor of character of business. This determination of favorable consideration is particularly significant in view of the differences in the composition of renegotiable and commercial businesses.

## II.

### *Efficiency.*

The Act, section 1213(e), provides that, in determining excessive profits, consideration shall be given to the contractor's efficiency, particularly with regard to attainment of quantity and quality of production, reduction of costs, and economy in the use of materials, facilities, and manpower. Plaintiff contends that it is entitled to favorable consideration under this factor, with which contention defendant's expert witness agreed, and it is so found.

Plaintiff was a highly efficient producer of quality greige goods which were manufactured by it or to which it applied finishes. It satisfactorily met all delivery schedules. The only rejections under renegotiable prime contracts or subcontracts related to deficiencies in material purchased from other manufacturers. Plaintiff enjoyed a reputation of being "the best in the business" for quality and price in the production of duck cloth.

Plaintiff's weaving and finishing facilities were operating at full capacity in 1966. The record is devoid of any evidence establishing specific economies in the use of manpower or facilities or specific reductions in costs as a result of efficiencies. No distinctions have been suggested between plaintiff's efficiency in performance of renegotiable contracts and its efficiency in performance of nonrenegotiable contracts.

### III.

### *Risk.*

Among the factors described in the Act, section 1213(e), is

Extent of risk assumed, including the risk incident to reasonable pricing policies.

Four areas of possible risk have been presented by the parties. First, economic risks inherent in fixed price contracts. Second, risks associated with hazardous operational techniques. Third, risks associated with possible loss of commercial customers. Fourth, risks associated with a diminution of earnings as a result of performing renegotiable business.

### 1. *Fixed price contracts.*

Plaintiff's contracts with the government and, at least in part, its subcontracts were fixed price. There is, however, no evidence that either material or labor costs were subject to wide fluctuation or that prices sufficient to cover costs and reasonable profits could not be accurately forecast at the time of contract execution. There is no evidence concerning possible shortages in materials. There is no evidence establishing any pattern of reductions in prices during 1966. Finally, with respect to such economic risks, the record contains nothing to distinguish renegotiable contracts from nonrenegotiable contracts. Accordingly, plaintiff is not entitled to favorable consideration with respect to the assumption of economic risks.

### 2. *Operational risks.*

Plaintiff's finishing operations at the Woodhead plant have been recognized as hazardous. The renegotiable finishing of osnaburg cloth is particularly hazardous and presented a high danger of fire. The fact that these operations were hazardous has been recognized by the government, and defendant's expert witness accorded plaintiff favorable consideration under this factor of risk.

This decision also accords plaintiff favorable consideration for the hazardous nature of its finishing operations, particularly osnaburg finishing. However, this considera- tion has been treated within the category of character of business, wherein it enhanced the consideration which plaintiff was accorded in that category, rather than within the category of assumption of risk. This different treatment is not a matter of substance but rather of terminology.

### 3. *Loss of Commercial Customers.*

Plaintiff contends that its performance of government work caused it to lose commercial customers at the time of its performance of government work and thereafter. These claims center around two commercial products which plaintiff was producing prior to and during the review year: book cloth and iron kloth. Each of these is discussed separately below.

*Book Cloth.* Plaintiff claims that, because of its government work, it was forced to stop production of a bookbinder cloth which it was developing, and which it anticipated would be highly profitable. Finishing operations on the bookbinder cloth began in 1965 and in 1966 plaintiff produced over 500,000 yards on equipment adjacent to that used in renegotiable FWWMR finishing. The book cloth is said to have become soiled and unmarketable as a result of the FWWMR processing. In late 1966 or early 1967, plaintiff decided to terminate book cloth operations and in 1968 and 1969 plaintiff produced virtually none of this cloth. Plaintiff claims, without supporting evidence, that it failed to recoup its research and development costs which were estimated generally as between $500,000 and $1,000,000.

Plaintiff introduced no evidence from potential, possible, or actual customers concerning the value of the book cloth in development. There is no evidence to support the estimate of a loss of research and development costs between $500,000 and $1,000,000. There is no explanation as to why, if the book cloth was so promising, its production was not resumed when renegotiable FWWMR finishing was ended. It is not possible to determine whether the book cloth, a new product, would have been suc-

cessfully marketed but for the intervention of renegotiable business.

Accordingly, it cannot be found that the loss of this potential business was the result of renegotiable business rather than the result of market conditions.

*Iron Kloth.* Plaintiff claims that it lost its iron kloth business because the same equipment needed for iron kloth production was devoted to government work. Iron kloth was produced for primarily one customer who accounted for about 90 percent of all of plaintiff's iron kloth production.

Iron kloth finishing was subject to volume fluctuation which was due, at least in part, to normal business cycle phenomena. Iron kloth yardage finished at Woodhead averaged 17 million yards per year from 1962 to 1965, with a high of 18 million yards and a low of 15 million yards. In 1966, the iron kloth production was about 12 million yards, a decline of 3 million yards from the previous low.

At some time during or after 1966—with the precise time frame being unspecified in the record—another company opened an iron kloth production facility. During 1967, 1968, and 1969, plaintiff's government work declined steadily, thereby freeing equipment for use in iron kloth finishing. In these years, however, plaintiff's iron kloth production did not either remain constant at 12 million yards or increase but rather continued to decline to 8 million yards in 1967 and 1968 and to only 4 million yards in 1969. In 1966 and thereafter, plaintiff's principal iron kloth customer did not obtain finished goods from any alternate source.

The decline in plaintiff's iron kloth production during 1966 and thereafter may have been the result of normal cyclical fluctuation, or the result of a decline in demand by plaintiff's principal customer, or the result of a rise in competition which took place wholly apart from—and indeed at times subsequent to—plaintiff's diversion of equipment to government work. Under these circumstances, the iron kloth production decline cannot be found to be a direct result of the conduct of renegotiable business. Plaintiff is thus not entitled to any favorable consideration on this ground.

### 4. *Diminution of Earnings as a result of renegotiable work.*

Plaintiff contends that its performance of renegotiable contracts resulted in overall earnings being less than if plaintiff had performed only nonrenegotiable contracts. Two specific issues are raised in this connection. First, plaintiff alleges that the use of weaving facilities in government work displaced commercial work and that, in fulfilling its commercial contracts, plaintiff incurred additional costs. Second, plaintiff alleges that it failed to achieve a position within the industry warranted by prior years' performance because of renegotiable business.

*Weaving Displacement.* Plaintiff's manufacturing facilities were operating at full capacity in 1966. Under renegotiable contracts, plaintiff manufactured approximately 2 million yards of cloth with sales of $1,160,975 and costs of $1,042,906. Plaintiff contends that because of the diversion of its weaving facilities to government work it was forced to purchase cloth from other manufacturers to fill commercial orders.

Over 7 million yards of cloth were so purchased, including twill, denim, and mercerized shirting, at a total price of about $2,900,000. Plaintiff does not assert that it sustained any actual out-of-pocket losses as a result of these purchases and hence the entire price of $2,900,000 was presumably passed on to plaintiff's customers, as part of its sales price. There is no explanation in the record as to why the renegotiable manufacture of about 2 million yards of cloth displaced facilities needed to manufacture about 7 million yards of cloth commercially.

Plaintiff argues that this purchase price of $2,900,000 exceeds, by $400,000, the estimated costs of $2,500,000 which it would have incurred had it manufactured this cloth in-house. Plaintiff thus claims the amount of $400,000 as an additional cost of doing renegotiable business. In fact, however, plaintiff's sales price for this cloth was also apparently about $2,900,000 and the difference between this price and the

$2,500,000 which it is estimated it would have cost for in-house manufacture represents the profit which plaintiff would have earned on such in-house manufacture. The claim here, therefore, is one for loss of commercial profits by reason of displacement by renegotiable business.

The renegotiable weaving itself generated a profit. Inasmuch as the volume of renegotiable weaving was less than the volume of commercial weaving which it allegedly displaced, with no explanation furnished for this difference, the total renegotiable profit was less than the $400,000 claimed. However, in dollar amount and as a percentage of sales, the renegotiable business returned the same profit as would have been earned in the commercial weaving of certain of those purchased goods with yardage equivalent to that manufactured under renegotiable contracts.[1]

Based on the available evidence, it cannot be found that renegotiable business was responsible for all commercial displacement. Similarly, it cannot be found that performance of the renegotiable weaving resulted in any diminution of profits. Plaintiff's claims in this respect are without merit. ·

*Rank Within Industry.* Plaintiff contends that its rank within industry in 1966 was below that which was to be expected based on its prior years' performance. Plaintiff further contends that this lowered stature was the result of renegotiable business and a diminution of earnings resulting therefrom.

Plaintiff had been consistently ranked as one of the top 10 within the 20 largest integrated textile mills in the United States. Plaintiff ranked eighth in terms of returns on sales and fourth in terms of returns on equity. Its rank within industry was essentially the same in the review year, 1966, as it had been in the prior 3 years. Thus there is no merit to plaintiff's contentions in this respect.

In terms of cash flow, plaintiff did not fare so well in the review year as it had during the prior years. Where, as here, profitability is high as a return on sales or equity, little reliance can be placed on cash flow statistics in the absence of detailed explanations of Graniteville's overall cash flow situation and the uses to which its earned profits were put. No such explanation is to be found in the record.

In addition to the statistics relating to rank within the industry, plaintiff points to statistics concerning overall average industry performance. Plaintiff consistently outperformed the industry generally with respect to average returns on sales, equity and related measures. In some cases, plaintiff did not outperform the industry in the review year to the same extent as it had outperformed the industry previously. (Plaintiff did not earn returns in its total 1966 business as high as had been earned previously and thus did not equal its own prior performance.) Plaintiff claims that this decline in performance was attributable to its undertaking renegotiable business.

Renegotiable business accounted for less than 10 percent of plaintiff's total business. Renegotiable rates of return exceeded commercial returns in 1966. Commercial returns in 1966 were however lower than its returns in the prior year, 1965, or than the average returns in 1964 and 1965. The commercial business, accounting for over 90 percent of the total, was the most significant factor influencing plaintiff's total 1966 returns. With commercial profit-to-sales ratio in 1966 of 7.9 percent, the renegotiable ratio computed exclusive of CFM at over 20 percent combines to form an overall total ratio of only 8.5 percent, which is below the average of 9.2 percent earned in 1964 and 1965.

Any diminution in plaintiff's 1966 performance, as compared with prior years, is most properly attributed to the diminution in its commercial earnings rather than to renegotiable business. The renegotiable business has not been found to have directly

---

1. A full description of these selected purchased goods is set forth in the findings of fact and need not be detailed here.

contributed to commercial diminutions, as was discussed above.

## IV.

### *Contribution to the Defense Effort.*

The Act, section 1213(e), provides that, in determining excessive profits, consideration be given to a contractor's contribution to the national defense effort, including inventive and developmental contribution and cooperation with the government and other contractors in supplying technical assistance. Plaintiff contends that it is entitled to favorable consideration under this factor by virtue of the efforts of one of its officers in providing needed suppliers to the government and by virtue of its own performance of government contracts.

The textile industry in 1965 and 1966 enjoyed a period of good commercial business activity and was not eager to accept renegotiable contracts with the government. Because of its needs in Vietnam, the government exhorted the industry to assist in production, warned of the possible use of rated orders, and called on representatives of the American Textile Manufacturers Institute to enlist their support. One of the ATMI members who was contacted, in 1965, was Mr. Deane, a vice-president of plaintiff. Mr. Deane enlisted the assistance of others in the industry and persuaded plaintiff to set an example by assigning some of its capacity to the performance of government contracts.

Most of Mr. Deane's efforts in connection with encouraging industry participation were apparently undertaken in 1965 and, while most commendable, cannot be considered as a contribution by plaintiff to the defense effort in the year under review, 1966. There is insufficient evidence in the record to determine the extent, if any, to which these efforts continued during 1966.

The assignment of capacity by plaintiff to government work is also insufficient to entitle plaintiff to consideration for contribution to the defense effort, and does not distinguish plaintiff from all other government contractors during periods of govern-

ment demand. *See Major Coat Co., Inc. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1, 41 (1976).

Plaintiff is not entitled to favorable consideration under this factor. Any risks associated with loss of commercial customers or diminutions in earnings as a result of devoting facilities to government rather than commercial work were considered above under the factor of risk.

## V.

### *Public Interest.*

The Act, section 1213(e), provides that in determining excessive profits, consideration be given to factors which the public interest, and fair and equitable dealing, may require. Other than the elements considered in connection with other statutory factors, the parties have not raised any issues under this factor.

## VI.

### *Accounting Issues.*

Only two of the accounting issues raised by the the parties have a significant effect on the amount of renegotiable profits and are discussed in detail here: (1) whether the value of greige goods furnished by customers (CFM) should be included in the cost-of-goods sold for purposes of allocating indirect expenses, and (2) the proper allocation of plaintiff's profit-sharing expense. Depending on the resolution of these issues, earned renegotiable profits may be about $600,000 as urged by plaintiff or about $1,000,000 as urged by defendant.

### *1. Allocations and CFM values.*

The cost-of-goods sold (COGS) of course includes material costs. The ratio of renegotiable COGS to total COGS is used as a basis for allocating to renegotiable business a portion of the total expenses for selling and advertising (S&A) and general and administrative expense (G&A). Plaintiff contends that the values of CFM should be included in the COGS not as an actual material expense, which it clearly would not

be, but for the purpose of allocating other items such as S&A and G&A. If CFM is not included for this purpose, the renegotiable COGS ratio is about 4 percent and renegotiable business thus absorbs about 4 percent of the total S&A and G&A. If CFM is included in COGS, the renegotiable COGS ratio is about 10 percent. This difference results because CFM values account for a far greater proportion of renegotiable business than of nonrenegotiable.

In urging the inclusion of CFM for purposes of the allocation of indirect expenses, plaintiff relies upon three main contentions. First, plaintiff argues that the finishing of greige goods generates indirect expenses, such as G&A and S&A, in consistent degrees regardless of whether the greige goods being finished are CFM, purchased, or manufactured in-house. Second, plaintiff relies upon the regulations of the Renegotiation Board, 32 C.F.R. § 1499.1–24(f) (1977), which recognize the propriety of including CFM for purposes of allocation in certain circumstances, such as where the contractor may incur the same indirect expenses, such as handling, storage and insurance, regardless of the source of the materials. Thirdly, plaintiff cites the decision of *Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976), *rehearing denied,* 549 F.2d 196, 211 Ct.Cl. 49 (1977), in which the similarities between CFM and purchased materials were noted for purposes of computing, and comparing, the profit return on sales.

The facts of the present case distinguish it from the situations relied upon by plaintiff and render the inclusion of CFM here, for allocation purposes, improper. For a full understanding, it is necessary to explore the operations performed by plaintiff, the source of materials, and the generation of the indirect expenses being allocated.

Plaintiff has focused on the generation of indirect expenses by reason of its finishing operations. If plaintiff performed *only* finishing operations on goods which it purchased or received from its customers, all indirect expenses such as G&A and S&A would be generated in connection with those finishing operations. The indirect expenses incurred in connection with finishing CFM may well be the same as the expenses incurred in connection with finishing greige goods from other sources. The values of purchased greige goods, as is frequently the case, might be included in and inseparable from the COGS and hence the value of these goods would be included for purposes of allocating the indirect expenses for G&A and S&A. Thus, it might also be appropriate to include the values of the CFM greige goods, as well as the purchased greige goods, for purposes of allocating the G&A and S&A expenses which were generated by the finishing of these materials. This is not the case here, however.

As described in section II above, plaintiff's total sales were attributable, in large part, to the manufacture of greige goods ($86,000,000), as well as to the finishing of goods from various sources (about $30,000,-000). Only minor and insignificant portions of total sales were attributable to the purchase of greige goods.[2]

It may be properly inferred that the extensive manufacturing operations generated considerable portions of indirect expenses, although no breakdown of the G&A and S&A expense pools has been furnished. The direct costs of manufacturing form a part of COGS and hence form a part of the base upon which all indirect expenses, G&A and S&A, are allocated.

For purposes of illustration, it may be assumed that one yard of cloth is manufactured, with a direct labor cost of $0.25, and is then finished, with a direct labor cost of $0.05. Of the total direct cost, $0.30, manufacturing represents 84 percent and finishing 16 percent. If G&A and S&A are allocated on a direct-labor ratio, manufacturing absorbs 84 percent of the indirect costs and finishing absorbs 16 percent.

---

**2.** The values of purchased materials have been included in COGS both as direct costs and for purposes of allocation. Neither party has contested the propriety of this inclusion and hence this inclusion is adopted, without discussion, as appropriate.

Finishing may also involve one yard of CFM. It may be assumed that the direct labor cost for this finishing was $0.05 per yard, similar to the cost of finishing one yard of manufactured cloth. If one yard of manufactured cloth and one yard of CFM are finished, the total direct labor cost is $0.35 (*i. e.*, $0.30 + $0.05). Manufacturing represents 72 percent (*i.e.*, $0.25 + $0.35) and finishing represents 28 percent with 14 percent attributable to finishing one yard of manufactured cloth (*i. e.*, $0.05 + $0.35) and 14 percent attributable to finishing one yard of CFM (*i.e.*, $0.05 + $0.35).

The allocation of G&A and S&A on this basis, excluding the value of CFM from the COGS, results in the manufacturing operations' costs absorbing a portion of the indirect expenses which these operations may have generated. Finishing operations also absorb a portion of the indirect expenses with the same absorption by the cost of finishing manufactured goods and by the cost of finishing CFM. The exclusion of CFM results in all finishing operations absorbing an appropriate share of indirect expenses regardless of the source of the goods being finished and based only on the direct costs of finishing. This is an appropriate allocation.

The inclusion of CFM in the COGS, as urged by plaintiff, would result in similar treatment of CFM and manufactured goods with both absorbing a portion of G&A and S&A as if the CFM had been manufactured. This would be inappropriate since the CFM was not in fact manufactured and cannot be found to have generated the type of indirect expense (G&A and S&A) associated with plaintiff's extensive actual manufacturing operations. Allocations based on inclusion of CFM would be inappropriate.

For the reasons set forth above, the CFM values are found to be properly excluded from the COGS for purposes of allocating such indirect expenses as G&A and S&A. Plaintiff's similar contentions, that CFM should be included in COGS for purposes of allocating net worth and capital between renegotiable and nonrenegotiable business, are found lacking in merit for the same reasons. Again, it may be properly inferred that net worth and capital were employed by plaintiff in connection with its extensive manufacturing operations, and such employment of assets in absent in connection with the values of the CFM cloth. Hence, CFM values are excluded from COGS for purposes of allocating net worth and capital as well.

## 2. Profit-based compensation.

▮ Plaintiff incurred an expense for compensation to employees based on its total gross profits (referred to herein as profit-based compensation). This profit-based compensation was computed based on a fixed percentage of gross profits, that is, the profits before deduction for the compensation itself. Thus the amount of the total profit-based compensation depended on the amount of gross profits. There is no dispute between the parties that the profit-based compensation was a proper and bona fide expense incurred by plaintiff allocable, in some part, to renegotiable business. The dispute here concerns the proper method of such allocation.

The total amount of profit-based compensation is approximately $2,700,000, or about 19 percent of total gross profits in the amount of approximately $14,000,000. Both parties agree that the amount of $2,700,000 is to be allocated between renegotiable and nonrenegotiable business.

Plaintiff contends that this expense should be allocated to renegotiable and nonrenegotiable business based on the level of gross profits realized in each segment of business. Thus, if renegotiable profits were 6 percent of total gross profits, plaintiff would allocate 6 percent of the total profit-based compensation to renegotiable business. This would result in the allocation of about $160,000 to renegotiable business to be subtracted from renegotiable gross profits resulting in a net renegotiable profit.

Defendant, on the other hand, contends that this expense, once computed in the total amount of $2,700,000, should be allocated to other expense pools such as indi-

rect manufacturing expense, G&A, and S&A. Such allocation would be based on the number of employees engaged in such efforts, and an allocation to indirect expenses and to renegotiable business based on the cost-of-goods-sold ratio (COGS) discussed above. This results in the allegation of about $90,000 to renegotiable business for profit-based compensation expense.

There is no evidence concerning the method by which this compensation, once computed in total amount, was to be paid to employees. Absent such evidence, it may be properly inferred that the payment would be made based on an employee's tenure, salary, or rank, or other fixed criteria, rather than on the profitability of the item or operation in which the employee was engaged. It might well be expected that a weaver of 30 years tenure would receive an equal or greater share of the profit-based compensation than would a weaver of 10 years tenure even though the greige goods manufactured by the senior weaver were a less profitable item than those made by the junior weaver. Similarly, if equal shares were distributed to weavers, it might well be assumed that the larger number of weavers involved in nonrenegotiable business would receive a greater portion of the compensation than would the smaller number of weavers involved in renegotiable business even though the latter, on the basis of a return of sales or other criteria, might be more profitable. Hence, regardless of the manner in which the total amount of profit-based compensation was computed, once computed it constitutes an expense which is properly allocated between renegotiable and nonrenegotiable business based on its manner of payment. See, e. g., Blue Bell Inc. v. United States, 556 F.2d 1118, 1130–31, 213 Ct.Cl. 442, 460–61 (1977).

The plaintiff has not contested the accuracy of the defendant's use of number of employees and COGS ratios for purposes of allocating this expense other than to urge, as its alternative, that it should be allocated on the basis of the gross-profit ratio. Accordingly, it is found that the number of employees and the COGS ratios adequately represent a proper basis for allocating the profit-based compensation between renegotiable and nonrenegotiable business and between the various expense items, such as indirect expense, G&A, and S&A, to which this item should be applied. It is not appropriate to allocate this expense on the gross-profit ratios as advocated by plaintiff.

An additional alternative reason exists for not adopting plaintiff's method of allocation based on gross-profit ratios. In contemporaneous filings, such as those with the Securities and Exchange Commission, plaintiff computed its amount of profit-based compensation and then included such amounts in various other expense categories such as G&A and S&A. It is not clear upon what precise basis plaintiff made such allocations, but the method is similar to that now urged by the Government, and, as discussed above, to that found to be proper. No convincing reason has been offered for treating this expense now in a manner different from the contemporaneous reports prepared by plaintiff. See Camel Mfg. Co. v. United States, 572 F.2d 280, 292–293, 215 Ct.Cl. 460, 483–84 (1978).

The amounts of profit-based compensation included within various expense items and in renegotiable and nonrenegotiable business are therefore as follows:

|  | Renegotiable | Nonrenegotiable | Total |
|---|---|---|---|
| Indirect Exp. | $63,535 | $1,990,085 | $2,053,620 |
| G & A Expense | 11,453 | 259,438 | 270,891 |
| S & A Expense | 14,982 | 339,364 | 354,346 |
| Total | $89,970 | $2,588,887 | $2,678,857 |

These allocations are based, primarily, upon the schedules presented by the government which, although not supported by additional or back-up data, were not contested by plaintiff as to accuracy.

### 3. Renegotiable Profits.

With the resolution of the two major accounting issues, as well as other smaller adjustments, the division between renegotiable and nonrenegotiable sales and profits is:

|  | Renegotiable | Nonrenegotiable | Total |
|---|---|---|---|
| Sales | $5,765,057 | $113,355,301 | $119,120,358 |
| Expenses | 4,601,056 | 104,393,362 | 108,994,418 |
| Profits | 1,164,001 | 8,961,939 | 10,125,940 |

Additional considerations taken into account in evaluating the reasonableness of these renegotiable costs and profits are discussed below.

### VII.

### Reasonableness of Costs and Profits.

The Act provides that in determinations of excessive profits, there should be taken into account the:

> Reasonableness of costs and profits with particular regard to volume of production, normal earnings, and comparison of war and peacetime products. [50 U.S.C. App. § 1213(e).]

Plaintiff, in urging that none of its earned renegotiable profits were excessive, places considerable emphasis upon this factor. Both expert witnesses stressed this factor and a wide variety of computations hereunder. Each of the various aspects of this consideration will be discussed separately.

### 1. Comparisons with other contractors.

There was no evidence concerning the sales, costs, or profits of the other companies who may have performed similar types of work under renegotiable contracts in 1966.

The record does contain the rates of returns earned by the integrated textile industry generally. Both before and during 1966, plaintiff's rates of return in its commercial business alone customarily exceeded the returns earned by the industry generally. There customary high returns of plaintiff may be the result of plaintiff's overall efficiency, as discussed in section II, above. In any event, in determining the reasonableness of plaintiff's renegotiable profits, the parties focused on comparisons with plaintiff's own commercial business.

### 2. Comparisons of Products.

The types of products made by plaintiff did not differ significantly between war and peacetime. The profit levels did vary, however, depending upon the particular product made and as between renegotiable and commercial business.

*a. Weaving or manufacturing.* Profits derived from weaving or manufacturing operations are expected to be lower than profits derived from finishing operations. In renegotiable business, plaintiff manufactured approximately 2 million yards of duck and similar cloth with sales of slightly over $1,000,000 and profits of approximately $118,000. The rate of return is 10.2 percent of sales.

With respect to this same product, manufactured duck cloth, plaintiff, in its commercial business, earned a return of sales of about 13 percent in 1965 and about 14 percent in the review year, 1966.

Although renegotiable profits were lower than commercial returns, plaintiff has not shown that this was the result of specific pricing policies, increased efficiencies between renegotiable and commercial duck cloth manufacture, or any specific losses in government work.

Based on this comparison, renegotiable weaving profits are reasonable, and plaintiff is entitled to favorable consideration under the factor of reasonableness to this extent.

*b. Finishing.* In renegotiable business, plaintiff applied FWWMR finishes to duck cloth in operations which were technologically complex and applied finishes to osnaburg in operations which were hazardous. In all, over 20 million yards of cloth were finished. Finishing sales, exclusive of the values of the greige goods being finished, were $3,274,008. Finishing profits were $1,045,932 (*i. e.,* total renegotiable profits of $1,164,001 less weaving profits of $118,069) or about 32 percent of sales.

In nonrenegotiable business, plaintiff applied a variety of finishes to about 2 million yards of duck cloth for total finishing sales of $294,756. All of the cloth was furnished by customers and the value of the CFM is excluded. Average profits on the various types of duck cloth finishes ranged from 18 to 28 percent of sales. Profits on the commercial finishing acknowledged to be most nearly comparable to the renegotiable FWWMR duck finish were 24.3 percent of sales.

No data concerning commercial operations of a nature similar to renegotiable osnaburg finishing was furnished. The hazards present in osnaburg finishing are considered to merit the same type of profits as are warranted by the complexities of FWWMR duck finishing, which is 24.3 percent of sales. Such a return in renegotiable business is deemed reasonable.

No explanation has been furnished justifying the renegotiable profits of 32 percent which exceed the commercial returns for similar finishing, of like complexity of about 24 percent.[3] Renegotiable finishing, in yardage and dollar revenue, was of a considerably larger volume than was the comparable commercial finishing. Renegotiable unit costs were below those in commercial finishing. The lower renegotiable unit costs may have been the result of acknowledged higher renegotiable volume. While the renegotiable unit sales price was below the commercial price it was not sufficiently lower so as to fully account for the lower renegotiable costs and to yield a profit-to-sales ratio similar to that earned in commercial business. Plaintiff has not attributed the higher renegotiable profits, on comparable operations, to any factor such as the specific effects of any particular efficiencies. It must, therefore, be inferred that these higher renegotiable profits were the result of the higher renegotiable volume. Where this is the case, the higher renegotiable profits cannot be found to be reasonable.

It is helpful at this point to consider what level of finishing profits in renegotiable business would yield a profit-to-sales ratio of 24.3 percent as earned in comparable commercial business. If renegotiable finishing sales of $3,274,008 (exclusive of the values of all greige goods being finished) and profits of $1,045,932 are each reduced by the amount of about $330,000, the resulting profit-to-sales ratio is 24 percent (*i. e.,* $715,932 ÷ $2,944,008). This application of adjustment factors to both sales and profits is in accord with 32 C.F.R. § 1460.3 (1977); *Gibraltar Manufacturing Co. v. United States,* 546 F.2d 386, 389, 212 Ct.Cl. 226, 230–31 (1976); and *Blue Bell, Inc. v. United States,* 556 F.2d 1118, 1125, 213 Ct.Cl. 442, 451 (1977).

It is recognized that the renegotiable finishing, producing sales of $3,274,008, involved the finishing of some manufactured and purchased goods as well as CFM, while the commercial finishing, producing sales of about $300,000, involved exclusively CFM. The values of all greige goods have been excluded from the finishing sales, as was the normal practice of plaintiff in exam-

---

**3.** Plaintiff too relies upon commercial finishing returns in the neighborhood of from 24 to 25 percent. In computing this return, the value of the greige goods being finished, all CFM, were *excluded* from sales. Plaintiff believes the renegotiable finishing return to be about 23 percent and, by comparison, reasonable. Such renegotiable return, however, would be based on finishing profits of $1,045,932 divided by sales of about $4,604,082 which *includes* the $1,330.074 value of "purchased" goods being finished as well as actual finishing sales of $3,274,008. These computations of commercial and renegotiable profit ratios are dissimilar and would not yield meaningful comparative data. (The computation of the greige goods' values is discussed in findings.)

ining the profitability of finishing operations. Differences in the source of materials are considered in connection with the employment of capital, section VIII following.

*c. Summary.* These product comparisons relate to only those portions of plaintiff's commercial business which have been identified as involving products of comparable complexity to those in renegotiable business. Based on such comparisons, manufacturing profits of 10.2 percent of manufacturing sales and finishing profits of 24.3 percent of finishing sales are reasonable. These products had, to some extent, been produced by plaintiff prior to and in 1966 in its commercial business. However, with overall profit rates of 8 percent of sales, and with manufacturing sales representing 75 percent of total sales and finishing sales representing 25 percent, the total commercial business was not uniformly comprised of the types of products generating the 10.2 percent and 24.3 percent returns noted above for the selected commercial products.[4]

## 3. Comparisons with "base" earnings

The comparisons between renegotiable profits and "base" earnings involve the plaintiff's rates of return on all commercial business generally. This commercial business was comprised primarily of manufacturing sales with lesser amounts of finishing sales involving a variety of products only a portion of which have been identified as similar to those involved in renegotiable business.

Plaintiff's total commercial earnings are as follows:

|                  | 1962  | 1963  | 1964  | 1965  | 1966  |
| ---------------- | ----- | ----- | ----- | ----- | ----- |
| Profit/Sales     | 6.8%  | 6.4%  | 8.9%  | 9.6%  | 7.9%  |
| Profit/Net worth | 15.8% | 15.5% | 22.9% | 26.4% | 22.0% |
| Profit/Capital   | 13.3% | 11.6% | 16.1% | 18.5% | 15.3% |

Renegotiable earnings may be compared with these commercial earnings as follows:

|                  | Average Commercial 1962–1965 | Average Commercial 1964–1965 | Commercial 1966 | Renego. 1966 |
| ---------------- | ---------------------------- | ---------------------------- | --------------- | ------------ |
| Profit/Sales     | 8.1%                         | 9.2%                         | 7.9%            | 20.2%        |
| Profit/Net worth | 20.5%                        | 24.8%                        | 22.0%           | 64.9%        |
| Profit/Capital   | 15.1%                        | 17.3%                        | 15.3%           | 45.2%        |

No data is available concerning CFM in the years 1962 to 1965, and the 1966 returns computed above are exclusive of CFM.

The 1966 data, taking into account CFM, is as follows:

|                          | Commercial    | Renegotiable |
| ------------------------ | ------------- | ------------ |
| Sales (excl. CFM values) | $113,355,301  | $5,765,057   |
| CFM values               | 9,894,215     | 7,899,693    |
| Profits                  | 8,961,939     | 1,164,001    |
| **Excluding CFM**        |               |              |
| Profit/Sales             | 7.9%          | 20.2%        |
| Profit/Net worth         | 22.0%         | 64.9%        |
| Profit/Capital           | 15.3%         | 45.2%        |

4. Uniform production of such products in commercial business would have resulted in a combined rate of return of about 13.6 percent rather than the approximately 8 percent return actually earned.

| Including CFM | Commercial | Renegotiable |
|---|---|---|
| Profit/Sales | 7.3% | 8.5% |
| Profit/Net worth* | 23.5% | 26.7% |
| Profit/Capital* | 16.4% | 18.5% |

\* These computations were based on net worth and capital amounts allocated to commercial and renegotiable business based on a cost of goods ratio which also included the values of CFM. If allocations are based on the COGS ratio exclusive of CFM, the rates of return here would be the same as those above excluding CFM.

---

In comparing renegotiable and commercial rates of return, there was considerable controversy between the parties as to the appropriate base period. Defendant contended that the average of 4 prior years, 1962 to 1965, was proper and plaintiff contended that the average of the two immediately preceding years, 1964 and 1965, was proper. Under defendant's base period, commercial earnings were, on the average, about 8 percent of sales and under plaintiff's base period commercial earnings were, on the average, about 9 percent of sales. These differences are relatively insignificant, particularly when compared with review year renegotiable returns of about 20 percent of sales (excluding CFM). For purposes of discussing the reasonableness of renegotiable profits generally, it is sufficient to note commercial rates of return of between 8 and 9 percent of sales.

There were few changes in plaintiff's business, labor, equipment or capitalization from prior years to the review year with the exception of the opening of a new manufacturing plant in 1966 (engaged primarily in commercial operations). The commercial business in 1966 exceeded, in sales, business in prior years but yielded a return on sales about the same as the average from 1962 to 1965. Commercial returns on sales, net worth, or capital in 1966 were about the same as returns in 1964 but were less than the returns in 1965 and less than the average return in 1964 and 1965.

*a. Excluding CFM.* Excluding the values of CFM, renegotiable business is comprised chiefly of finishing sales while commercial business is comprised chiefly of manufacturing sales. The two operations differ with respect to their character, complexity, risk, and profitability. The rates of return in commercial and renegotiable business can, based on their operational mix, be expected to differ.

Comparisons between the 8 or 9 percent overall commercial return and the 20 percent renegotiable return are, therefore, of little value in evaluating the reasonableness of the renegotiable combined manufacturing and finishing returns. (A downward adjustment of about \$764,000 in both renegotiable sales of \$5,765,057 and profits of \$1,164,001 would be necessary to yield an 8 percent return on combines sales.)

There is no data available which computes the commercial overall manufacturing profit or the overall finishing profit. With profits of about \$8,962,000 representing 8 percent of sales comprised of 75 percent manufacturing and 25 percent finishing, and with manufacturing profit customarily not exceeding finishing profits, any number of combinations are possible. Manufacturing profits could range from 1 to 8 percent of manufacturing sales and finishing profits could range from 29 to 8 percent of finishing sales respectively. In combination, for example, a manufacturing return of 3 percent and a finishing return of 23 percent would yield a combined rate of return of 8 percent; similarly, a manufacturing return of 7.0 percent and a finishing return of 11.0 percent would yield the combined rate of 8 percent in commercial business.

In renegotiable business, with its distinctive operational mix, the same combinations

of manufacturing and finishing returns. may result in different combined ratios. For example, if manufacturing profits were 3 percent of manufacturing sales and finishing profits were 23 percent of finishing sales, the combined ratio would not be 8 percent as was the result in the commercial business but would be about 13.4 percent.[5] Based on the possible commercial manufacturing returns and finishing returns, renegotiable business could yield combined profits-to-sales ratios of from 7 to 17 percent.

The actual commercial manufacturing profit and finishing profit, if known, could therefore be applied to renegotiable business and a combined rate of return different from the combined commercial rate of return may result, purely due to differences in the proportions of total business represented by the various operations.

It is therefore of little value to compare combined renegotiable profit-to-sales ratios with combined commercial profit-to-sales ratios. While such comparisons may reveal the dollar renegotiable profits sufficient to yield a return of 8 percent on all sales, they do not establish the amount of profit sufficient to yield a renegotiable return on actual manufacturing sales similar to that earned commercially or a renegotiable return on actual finishing sales similar to the return earned in commercial finishing generally.

*b. Including CFM.* Including the values of CFM, renegotiable business may be divided into 76 percent attributable to the values of all greige goods (manufactured, purchased, and CFM) and about 24 percent attributable to finishing sales (*i. e.*, $3,274,008 ÷ $13,664,750). This more nearly approximates the commercial operational mix.

Including CFM values, the renegotiable and commercial rates of return on sales are roughly equivalent and it is upon this equivalency that plaintiff alternatively bases its contentions that its renegotiable profits are reasonable. Such comparisons, however, are also of little value due to differences between the commercial and renegotiable sales.

In renegotiable business, the vast majority of the 75 percent of sales represented by greige goods' values is attributable to the CFM (and to purchased goods as well). In connection with such CFM, plaintiff itself earned no manufacturing profit and the stated value of the CFM included the manufacturing profit which was actually earned by the supplier of the goods. In commercial business, on the other hand, the vast majority, if not all, of the 75 percent of sales represented by greige goods' values is attributable to in-house manufacture. The sales values of the manufactured goods include a profit which plaintiff itself earned and this profit is also, of course, included in the total commercial profits.

Where the commercial profit-to-sales ratio includes a profit on extensive manufactured greige goods and the renegotiable ratio does not include a manufacturing profit for the considerable quantities of CFM, any comparison of the respective ratios involves comparisons of dissimilar operations. Such comparisons are therefore of little if any value in determining the reasonableness of renegotiable profits.

Defendant has urged that if renegotiable and commercial business, with CFM included in sales, are to be truly comparable, a manufacturing profit should be computed on and imputed to the CFM values. This would, in effect, simulate manufacturing operations and treat the CFM as if plaintiff had manufactured these greige goods in-house and had earned the manufacturing profit.

The purpose of restructuring renegotiable business to arrive at an operational mix of manufacturing and finishing similar to commercial business is apparently to ascertain the reasonableness of combined re-

---

5. Manufacturing sales of $1,160,975 and profits of $118,069 reduced by about $85,000 would yield a 3 percent return. Finishing sales of $3,274,008 and profits of $1,045,932 reduced by about $380,000 would yield a 23 percent return. Combined sales and profits adjusted by about $465,000 would yield a 17.6 percent return. When sales are inclusive of the $1,330,074 for purchased renegotiable goods, the ratio is 13.2 percent.

negotiable profits when compared with combined commercial profits. The profit ratio imputed to CFM, since it is artificially computed and not actually earned cannot be found to be unreasonable and will establish the reasonable level of manufacturing profits. Since the base or reasonable level of overall profits would be the 8 percent earned in overall commercial business, the selection of a reasonable manufacturing profit will predetermine the reasonable level of finishing profits. If manufacturing profits are as high as 7 percent of manufacturing sales, finishing profits may be as low as 11 percent of finishing sales so as to combine, based on restructured renegotiable operational mix, to form an overall 8 percent return. If, on the other hand, manufacturing profits are as low as 3 percent, finishing profits may be as high as 23 percent. The selection of a reasonable manufacturing profit, for imputation to CFM, may foreordain the amount of renegotiable profits, both manufacturing and finishing, which will be found to be unreasonable when compared with overall commercial returns of about 8 percent.[6]

The actual level of commercial manufacturing profits, which combined with finishing profits to form an overall rate of return of 8 percent is not known. Hence, there is no evidence in the record to support the selection of any particular manufacturing profit ratio, for imputation to renegotiable CFM, as reasonable based on commercial earnings. If the manufacturing profit imputed to CFM, and deemed reasonable, is too high, plaintiff may be permitted to retain too few finishing profits when adjusting all sales and profits so as to yield an 8 percent combined return. In renegotiable business it was the finishing operations which generated the majority of actual revenues and earned profits now subject to adjustment.

Defendant's expert witness, in computing the imputed CFM profit, undertook a number of extrapolations based on a panoply of assumptions. He relied primarily upon the actual earned renegotiable manufacturing profits rather than on any data concerning the "base" commercial manufacturing profits. Under the circumstances described above, this approach does not assure that the selected manufacturing profit for imputation to CFM is reasonable, in terms of commercial earnings, or that it will result in an appropriate determination of reasonable combined renegotiable profits. The reconstruction of renegotiable business, by including CFM and imputing a profit thereto, is thus of little value in determining reasonable renegotiable profits in manufacturing, finishing, or overall.

## VIII.

### Net Worth, Capital, and CFM.

The Renegotiation Act provides that, in determining excessive profits, consideration is to be given to the amount and sources of capital employed net worth, and sources of material. (50 U.S.C. App. § 1213(e)(2).) A contractor who provides his own capital, rather than relying upon government sources or customer financing, is entitled to more favorable consideration than a contractor who is dependent on outside sources of capital. Defendant's expert witness found plaintiff entitled to favorable consideration in this regard.

In its renegotiable business, as well as commercial business, plaintiff relied primarily upon its own capital and assets and received little financing from the government or from customers. For this, plaintiff is entitled to favorable consideration.

The great majority of plaintiff's total capital was employed in commercial business of which manufacturing was a large part. In connection with commercial business, most finishing involved the greige goods which plaintiff manufactured for which it employed its capital and assets. In renegotiable business, most finishing involved CFM greige goods in connection with the manufacture of which plaintiff neither employed its capital nor utilized its facilities.

---

**6.** Detailed computations illustrating the effect of particular selections of reasonable manufacturing profits are set forth in the Findings of Fact.

However, in connection with those commercial finishing products which have been identified as comparable, in complexity, to those involved in renegotiable finishing, all greige goods finished were CFM. In the renegotiable finishing of these products, on the other hand, some greige goods were purchased, as well as manufactured. In connection with the purchase and manufacture of these greige goods, plaintiff did employ its own capital. (Plaintiff earned a profit on the in-house manufacture of these greige goods but did not earn a profit on the value of the purchased greige goods.)

To the extent that comparisons are made between the rate of return (24.3 percent) earned on finishing commercial CFM comparable to renegotiable products and the rate of return (32 percent) earned on renegotiable finishing involving purchased and manufactured greige goods, as well as CFM goods, plaintiff is entitled to favorable consideration for the employment of its own capital in connection with the manufacture and purchase of the greige goods.

## IX.

### Excessive Profits.

■ Plaintiff has been found to be entitled to favorable consideration for such qualitative statutory factors as (1) the character of business, including the complexity and hazardous nature of operational techniques, (2) efficiency, and (3) employment of capital. Plaintiff has also been found to be entitled to favorable consideration under the more quantitative factor of reasonableness of profits to the extent warranted by various statistical comparisons.

In comparisons with plaintiff's commercial and renegotiable business generally, renegotiable profits and sales would require a downward adjustment of about $764,000 in order to yield the commercial "base" return of about 8 percent, based on returns on sales excluding CFM. The remainder of plaintiff's earned renegotiable profits, $400,000, were reasonable based on this comparison. In comparisons with the commercial products similar in complexity to those in renegotiable business, plaintiff's

renegotiable manufacturing profits were reasonable and finishing profits and sales would require a downward adjustment of about $330,000 in order to yield returns equivalent to those earned commercially. The remainder of plaintiff's earned renegotiable profits, or $834,001, were reasonable based on this comparison.

As is frequently, and unfortunately, the situation in this type of litigation, the parties each selected a different standard from which to evaluate the excessiveness of renegotiable profits. The defendant's expert witness relied upon the comparisons of plaintiff's commercial and renegotiable profits generally and determined, on this basis, that renegotiable profits of about $764,000 were unreasonable. Using this as a "starting point," defendant's expert witness then computed an amount of profit which it deemed sufficient to compensate plaintiff for the favorable consideration it was accorded under the statutory factors. He proposed the use of 12.5 percent of capital used in renegotiable business, or $325,000, as sufficient for this consideration. The amount of unreasonable profits of $764,000 would thus be reduced by $325,000 and the determination of excessive profits would be $440,000 approximately.

There are several difficulties with the defendant's approach. First, the ascertainment of $764,000 as the amount of unreasonable profits was based on adjusting renegotiable sales and profits so as to yield the 8 percent combined rate of return earned in commercial manufacturing and finishing, i. e., overall business generally. However, the composition of commercial and renegotiable business differed with respect to the proportions of manufacturing and finishing sales. The rates of return on the distinct commercial operations of manufacturing and finishing are not known. If these rates were for example, 3 percent and 23 percent of respective commercial manufacturing and finishing sales, the renegotiable sales and profits need be adjusted downward by only about $465,000 to yield similar rates of return. Based on the possible ranges of manufacturing and finishing

profits which may have been present in commercial business, combining to form an overall rate of return of about 8 percent, the renegotiable sales and profits may be adjusted to yield similar manufacturing and finishing profits-to-sales ratios by downward adjustments of from $265,000 to $800,000 approximately. Therefore, the proposed reduction in renegotiable profits and sales of $764,000 cannot be found to accurately compute the amount by which renegotiable rates of return, in distinct manufacturing and finishing operations, and hence in combination, actually exceeded those earned in commercial manufacturing, finishing, or both, that is, "base earnings."

Second, there is little if any explanation by defendant supporting its use of a 12.5 percent ratio applied to renegotiable capital, as opposed to, for example, a 15 or 20 percent ratio or a ratio applied to some other standard. The selection of the proper ratio was described as a "matter of judgment" but there is little in the record to support the use of $325,000 as an appropriate judgment or as an adequate adjustment for the favorable consideration to which plaintiff has been found to be entitled under the statutory factors.

The use of the base period data itself is no assurance that renegotiable operations, manufacturing and finishing, yielded returns in an amount of $764,000 above those which were earned generally in commercial business. The use of an adjustment of $325,000 provides no assurance that such an amount sufficiently compensates plaintiff for the statutory factor consideration to which it is entitled since, in comparisons between renegotiable and commercial business generally, several differences have been noted, such as the greater complexity and hazards present in renegotiable business. Thus, the defendant has failed to offer sufficient statistical data or other persuasive evidence to support its contention that plaintiff's renegotiable profits were excessive in the amount of approximately $440,000 (i. e., $764,000—$325,000).

The plaintiff's approach focused not on comparisons of renegotiable and commercial business generally but on comparisons between the rates of return earned in each segment of business with respect to comparable or similar products. On this basis, based on corrected computations which differ somewhat from those relied upon by plaintiff, renegotiable profits were found to be unreasonable in the amount of $330,000.

These comparisons involve operations or products of similar complexity or hazard. Therefore, if this comparison is utilized to evaluate reasonableness or excessiveness of plaintiff's renegotiable profits, no additional consideration need be given to plaintiff for the character of its renegotiable business. See, e.g., Camel Mfg. Co. v. United States, 572 F.2d 280, 305, 215 Ct.Cl. 460, 505–06 (1978). Similarly, these comparisons concern plaintiff's own efficient performance in its commercial and renegotiable business, which efficiency has not been distinguished between the two segments of total business. Thus, since plaintiff is compared to itself, rather than to average industry returns generally which were customarily lower than plaintiff's returns perhaps due to plaintiff's superior efficiency, no additional consideration need be given to plaintiff for its efficiency.

These comparisons, however, are based on selected portions of commercial and renegotiable business which differ with respect to employment of capital. The commercial finishing products, upon which a reasonable level of profits of 24.3 percent of sales was calculated, dealt exclusively with CFM. The renegotiable finishing, on the other hand, included some greige goods which plaintiff itself manufactured or purchased in connection with which plaintiff employed capital or utilized assets. The purely statistical comparison between returns earned on comparable commercial and renegotiable products does not reflect the favorable consideration to which plaintiff is entitled under the statutory factor of employment of capital. With consideration of this factor, the amount of $330,000 computed as unreasonable renegotiable profits based on these comparisons would be reduced to about $300,000. This adjustment is considered ad-

equate to compensate plaintiff for its favorable statutory factor consideration in this respect.

On the record presented here the comparisons between plaintiff's renegotiable earnings and commercial earnings generally, whether including or excluding CFM (together with the various refinements suggested with respect to treatment of CFM such as imputation of manufacturing profit thereto), are of limited utility in the absence of pertinent data concerning the commercial manufacturing profits and finishing profits generally. Were such comparisons meaningful in a statistical sense, additional adjustments would be necessary in view of plaintiff's statutory factor consideration. Both the statistical analysis and the statutory factor consideration are addressed by the comparisons between renegotiable and selected comparable commercial products. While the presence of only one meaningful comparison is somewhat limiting, in the circumstances here it is deemed sufficient to establish a reasonable "base" level of products and to adequately compensate plaintiff for its favorable statutory factor consideration. Where plaintiff has offered no other evidence upon which to evaluate the sufficiency of this quantification of its entitlement under the factors, it cannot complain that the credit given is insufficient. *See Camel Mfg. Co. v. United States*, 572 F.2d 280, 307–308, 215 Ct.Cl. 460, 509–10 (1978).

Based on all of these considerations, it is determined that plaintiff's earned renegotiable profits were excessive in the amount of $300,000. Reduction of renegotiable sales and profits by this amount yields adjusted sales of $5,465,057 and profits of $864,001 for a profit-to-sales ratio on combined business of 15.8 percent. The allowed rate of return on manufacturing sales is 10.2 percent and on adjusted finishing sales is 25 percent. These returns are reasonable when compared with similar commercial operations and adequately compensate plaintiff for its general efficiency, its performance of complex and hazardous operations, and its employment of capital.

## X.

### Conclusion.

The record establishes that plaintiff's earned renegotiable profits of $1,164,001 are reasonable to the extent of $864,001 and excessive to the extent of $300,000. Accordingly, excessive profits are found in the gross amount of $300,000 for the fiscal year 1966, with this amount to be decreased by appropriate tax credits and to be adjusted for interest as allowed by law.

### CONCLUSION OF LAW

Upon the findings of fact, the appendix and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court determines that for the fiscal year 1966 plaintiff realized excessive profits in the gross amount of $300,000 with this amount to be decreased by appropriate tax credits and to be adjusted for interest as allowed by law.*

---

* Plaintiff had paid the net amount of $298,184.12 due pursuant to the order of the Renegotiation Board on December 1, 1971.